## THOMAS *v.* CITY OF RICHMOND.

1. Where the issue of bills as a currency (except by banking institutions) is prohibited, a municipal corporation has no power, without express authority, to issue such bills; and if it does issue them, the holders thereof cannot recover the amount, either in an action on the bills themselves, or for money had and received.
2. Especially is this so, where the receiving, as well as issuing, of unlawful bills is expressly prohibited.
3. A law authorizing and requiring the redemption of such bills, passed by the legislature of one of the late Confederate States in aid of the rebellion, cannot be recognized or enforced.
4. *Semble;* that a bank or other private corporation issuing bills contrary to law, might be compelled to pay the holder in an action for money had and received, although the bills themselves were void, if the receiving of the bills were not expressly prohibited.
5. But if the receiving as well as issuing were prohibited, both parties would be in *pari delicto,* and no action could be sustained for the amount of the bills.

6. The law as to the recovery of money paid on an illegal contract stated and defined.

Error to the Circuit Court for the District of Virginia, on a suit upon certain notes issued during the rebellion by the city corporation of Richmond; the case being thus:

A statute Virginia passed in 1854, and reproduced in the code of 1860, thus enacts:

"Section 15. All members of any association, or company, that shall trade or deal as a bank, or carry on banking without authority of law, and their officers and agents therein, shall be confined in jail not more than six months, and fined not less than $100, nor more than $500.

"Section 16. Every free person,* who, with intent to create a circulating medium, shall issue, without authority of law, any note or other security, purporting that money or other thing of value is payable by, or on behalf of, such person, and every officer and agent of such person therein, shall be confined in jail," &c.

"Section 17 If a free person pass or *recei٠٠* in payment any note or security, issued in violation of either of the two preceding sections, he shall be fined not less than $20 nor more than $100"

"Section 19. In every case where a note of a less denomination than $5 is offered or issued as money, whether by a bank, corporation, or by individuals, the person, firm, or association of persons, corporation, or ١٠٦v politic so issuing, shall pay a fine of $10."

By the charter of the city of Richmond,† that city "may contract or be contracted with," and is endowed generally with "all the rights, franchises, capacities, and powers appertaining to municipal corporations." The charter also provides that "the council of the city may in the name and for the use of the city contract loans, and cause to be issued certificates of debt or bonds."‡

---

* By the express provision of the enactment the word "person" includes corporation.

† Chapter 54 of the code of 1849, p. 282, was followed by the act of March 30th, 1852 (Session Acts, p. 259), and the act of March 18th, 1861 (Ib. 153).

‡ Sessions Acts, 1852, p. 265, § 46; 1861, p. 169, § 75.

In this state of things the city of Richmond, in April, 1861, upon the breaking out of the rebellion, passed an ordinance for the issue by the city of $300,000, of corporation notes of $2, $1, 50 cents, and 25 cents; and the notes were accordingly issued; the city receiving in exchange the bank notes of the State then in circulation, between which and gold the difference at the time, compared with what it became subsequently, was small; five per cent. to ten per cent.

On the 19th March, 1862, and the 29th of the same month and year, a so-called "legislature of Virginia," the body being composed of representatives from parts of the State in rebellion against the Federal government, passed an act, by whose language the issue of the sort of notes in question was made valid, and the city obliged to redeem them.

In October, 1868, the rebellion being now suppressed, and the city refusing to pay the notes, one Thomas and others, holders of a quantity of them, brought *assumpsit* against the city of Richmond, in the court below, to recover certain ones which they held. The declaration contained a special count on the notes and the *common money counts.* The defendants pleaded the general issue and the statute of limitations. A jury being waived, the case was tried by the court, which found:

1st. That the notes were void when they were issued, because they were issued to circulate as currency, in violation of the law and policy of the State of Virginia, and,

2d. That the said notes were not made valid or recoverable by the acts of the 19th March, 1862, and 29th March, 1862, or either of them, because the said acts were passed by a legislature not recognized by the United States, and *in aid of the rebellion.*

The court accordingly gave judgment for the defendant. To review that judgment the case was brought here by the plaintiff.

*Mr. Conway Robinson, for the plaintiff in error:*

1. Under the powers which the city of Richmond had, by its charter, it might receive from those who would lend or

advance it, the amount now in question, and might agree to refund it.

2. The amount has been actually received by the city in money or its equivalent. This money the city is under an obligation to refund, and there is a right of action for it as money lent or money received. "It is not the policy of the law," says Alderson, B., "that he who has another man's money may keep it."[*]

Whether the notes be valid or void, the holders may recover on the money counts.[†] Under the statute of 9 Anne, c. 16, a note for money lent to game with was void; yet an action was maintained for money lent under a parol contract.[‡] In A. D. 1760, where the bill of exchange included £300, lent by the plaintiff to Sir John Bland, at the time and place of play, though by force of the bill the plaintiff could not recover anything (the statute making that utterly void), yet the King's Bench gave judgment for £300, under the common count for money lent.[§]

Whatever may be the structure of the statute of Virginia in respect to prohibition and penalty about small notes, it is not to be taken for granted that the legislature meant that contracts in contravention of it were to be void in the sense that they were not to be enforced in a court of justice.[||]

But if this were otherwise, prior enactments against small notes is repealed, by the act of March 19th, 1862, so far as in conflict therewith; and by the latter there is a release of forfeitures and penalties incurred before its passage; neither is there anything in *Texas* v. *White*,[¶] which should prevent the latter act having full effect.

*Mr. John A. Meredith, contra, for the city.*

---

[*] Bousfield *v.* Wilson, 16 Meeson & Welsby, 188; and see Brooks *v.* Martin, 2 Wallace, 81.

[†] 4 Robinson's Practices, ch. 87, 88, 89, p. 547, *et seq.*

[‡] Barjeau *v* Walmsley, 2 Strange, 1249.

[§] Robinson *v.* Bland, 2 Burrow, 1081; and see Sutton *v.* Toomer, 7 Barnwall & Cross (14 English Common Law), 416; Utica Insurance Company *v.* Scott, 19 Johnson, 6; Same plaintiff *v.* Kip, 8 Cowen, 24.

[||] Harris *v.* Runnels, 12 Howard, 84; Sortwell, &c. *v* Hughes, 1 Curtis, 247.

[¶] 7 Wallace, 733.

Mr. Justice BRADLEY delivered the opinion of the court.

First. The court finds as a fact that the notes upon which the present action is brought were issued to circulate as currency; and, as matter of law, that this was in violation of the law and policy of Virginia, and that, therefore, the notes were void.

The first question is, whether the issue of notes as currency by the Common Council of the city of Richmond, in April, 1861, was against the law and policy of Virginia. The issue of notes as a common currency, or circulating medium, is guarded with much jealousy by all governments as touching one of its most valuable prerogatives, and as deeply affecting the common good of the people. Almost every State has stringent laws on the subject, and it may be said to be against the public policy of the country to allow individuals or corporations to exercise this prerogative without express legislative sanction. The State of Virginia, like all the other States, had a law of this kind in operation at the time the notes in question were issued. The issue of the notes in question was clearly in violation of this law; and it will be perceived that the 17th section makes the receipt of such notes in payment, as well as the issue and passing of them, a penal offence.

But the charter of the city of Richmond has been referred to for the purpose of showing that the Common Council had power to issue such notes. One of the grants of power relied on is, that the city is made a corporation with power to contract and be contracted with, and generally with "all the rights, franchises, capacities, and powers appertaining to municipal corporations." In a community in which it is against public policy, as well as express law, for any person or body corporate to issue small bills to circulate as currency, it is certainly not one of the implied powers of a municipal corporation to issue such bills. Such a corporation "can exercise no power which is not, in express terms, or by fair implication, conferred upon it."* Another clause

---

* Thomson *v.* Lee County, 3 Wallace, 330.

of the charter to which reference has been made authorizes the council to borrow money and to issue the bonds or certificates of the city therefor. But this cannot be seriously urged as conferring the right to issue such bills as those now in suit. Such city securities as those authorized by the charter are totally different from bills issued and used as a currency or circulating medium. The distinction is well understood and recognized by the whole community. A power to execute and issue the one class cannot, without doing violence to language, be deemed to include power to issue the other. We do not hesitate to say, therefore, that the Common Council of Richmond had no power or authority to issue such paper, and that they could not bind the city thereby.

It is contended, however, that although the notes themselves should be deemed void, yet the city received the money therefor, and ought not, in conscience, to retain it; and, therefore, that the action can be maintained on the count for money had and received.

If the defendant were a banking or other private corporation, and had issued notes contrary to law, and had incurred penalties therefor, no penalty being imposed upon the receiver or holder of the notes, this argument might be sound. In the case of *The Oneida Bank* v. *The Ontario Bank*,\* in which the defendant had issued post notes contrary to a statute of New York, it was held that the holder could recover the money advanced therefor. "The argument for the defendant against this position," says Chief Justice Comstock, " rests wholly on the idea that Perry, in receiving the post-dated drafts, was as much a public offender as the bank or its officers issuing them. . . . But such were not the relations of the parties. . . . Whatever there was of guilt, in the issuing of the drafts, it was the creature of the statute. . . . By that authority, and that alone, the bank is prohibited from issuing, but not the dealer from receiving; and the punishment is denounced only against the individual banker,

---

\* 21 New York, 496.

or the officers, agents, and members of the association. . . .
If the issuing of the drafts was prohibited, and if they were
also void, Perry, nevertheless, had a right to demand and
recover the sums of money which he actually loaned to the
defendant." This is in accordance with the general prin-
ciples of law on this subject. Lord Mansfield, in *Smith* v.
*Bromley*, as long ago as 1760, laid down the doctrine, which
has ever since been followed, in these words: " If the act be
in itself immoral, or a violation of the general laws of public
policy, both parties are *in pari delicto,* but where the law vio-
lated is calculated for the protection of the subject against
oppression, extortion, and deceit, and the defendant takes
advantage of the plaintiff's condition or situation, then the
plaintiff shall recover."[*]   In that case the plaintiff had given
the defendant money to sign her brother's bankrupt certifi-
cate, and she was allowed to recover it back, the law pro-
hibiting any creditor from receiving money for such a pur-
pose. Whilst the general principle has been frequently
recognized, the application of it to particular cases has been
somewhat diverse. Mr. Frere, in his note to *Smith* v. *Brom-
ley,*[†] thus sums up the result of the cases: A recovery can
be had, as for money had and received (1st) where the ille-
gality consists in the contract itself, and that contract is not
executed—in such case there is a *locus pœnitentiæ,* the *delictum*
is incomplete, and the contract may be rescinded by either
party; (2d) where the law that creates the illegality in the
transaction was designed for the coercion of one party and
the protection of the other, or where the one party is the
principal offender and the other only criminal from a con-
strained acquiescence in such illegal conduct—in such cases
there is no *parity of delictum* at all between the parties, and
the party so protected by the law, or so acting under com-
pulsion, may, at any time, resort to the law for his remedy,
though the illegal transaction be completed.[‡]

---

[*] 2 Douglas, 696, n.                                    [†] Ib. 697, a.

[‡] See the cases collected in 2 Comyn on Contracts, 108–131; 1 Selwyn's
Nisi Prius, 87–100; 3 Phillips on Evidence, 119; 2 Greenleaf on Evidence,
§ 121, p. 120; Chitty on Contracts, 550, 552, 553, and notes.

Now, in cases of bills, or other obligations, illegally issued by a banking or other private corporation, which has received the consideration therefor, it would enable them to commit a double-wrong to hold that they might repudiate the illegal obligations, and also retain the proceeds. Hence, where the parties are not *in pari delicto*, actions are sustained to recover back the money or other consideration received for such obligations, though the obligations themselves, being against law, cannot be sued on. The corporation issuing the bills contrary to law, and against penal sanctions, is deemed more guilty than the members of the community who receive them whenever the receiving of them is not expressly prohibited. The latter are regarded as the persons intended to be protected by the law; and, if they have not themselves violated an express law in receiving the bills, the principles of justice require that they should be able to recover the money received by the bank for them. But if the parties are *in pari delicto*, as, if the consideration as well as the bills or other obligation is tainted with illegality or immorality, as it would be if loaned or advanced for the purpose of aiding in any illegal or immoral transaction, or if the receiving as well as passing or issuing the bills is forbidden by law, then the holder is without legal remedy, and the parties are left to themselves.

But, in the case of municipal and other public corporations, another consideration intervenes. They represent the public, and are themselves to be protected against the unauthorized acts of their officers and agents, when it can be done without injury to third parties. This is necessary in order to guard against fraud and peculation. Persons dealing with such officers and agents are chargeable with notice of the powers which the corporation possesses, and are to be held responsible accordingly. The issuing of bills as a currency by such a corporation without authority is not only contrary to positive law, but, being *ultra vires*, is an abuse of the public franchises which have been conferred upon it; and the receiver of the bills, being chargeable with notice of the wrong, is *in pari delicto* with the officers, and should

have no remedy,.even for money had and received, against the corporation upon which he has aided in inflicting the wrong.   The protection of public corporations from such unauthorized acts of their officers and agents is a matter of public policy in which the whole community is concerned. And those who aid in such transactions must do so at their peril.

According to these principles no recovery could have been had against the city, either on the bills themselves or on a claim for money had and received.   It was against the law of the State to issue them.   It was a penal offence in both the person who paid and the person who received them, and they were issued by a municipal corporation which had no power, and which was known to have no power to issue them.

It was insisted further, however, that the legislature, in March, 1862, passed laws which authorized, and even required, the city to redeem these bills.   But,

Secondly. The court found that these laws were passed by a legislature not recognized by the United States and in aid of the rebellion, and, therefore, that these notes were not made valid thereby.

The fact thus found, that the laws referred to were passed in aid of the rebellion, is conclusive on the subject.   We have already decided, in *Texas* v. *White*,[*] and just now in the case of *Hanauer* v. *Doane*,[†] that a contract made in aid of the rebellion is void, and cannot be enforced in the courts of this country.   The same rule would apply, with equal force, to a law passed in aid of the rebellion.   Laws made for the preservation of public order, and for the regulation of business transactions between man and man, and not to aid or promote the rebellion, though made by a mere *de facto* government not recognized by the United States, would be so far recognized as to sustain the transactions which have taken place under them.   But laws made to promote and aid the rebellion can never be recognized by, or receive the sanction

---

[*] 7 Wallace, 700.        [†] The preceding case; *supra*, 342.

of, the courts of the United States as valid and binding laws. To recognize them as such would be derogatory to the dignity and authority of the government of the United States, and would be setting too light an estimate upon so great an offence.

JUDGMENT AFFIRMED.