# Wytheville.

## ISAACS, TAYLOR & WILLIAMS V. CITY OF RICHMOND.

### JUNE 15th, 1893.

1. CONSTITUTIONAL LAW.—Any act whose necessary operation impairs, or tends to impair the supremacy of the Constitution, is void, no matter what may have been the purpose of the legislature in enacting it.
2. CITY COUNCIL—*Notes as Currency—Case at bar.*—Under an ordinance in 1861, city of Richmond issued notes to circulate as currency. Evidence showed that one object was to aid the rebellion.

HELD :

The notes were void.

Argued at Richmond.   Decided at Wytheville.

Appeal from decree of the chancery court of the city of Richmond, rendered November 23, 1889, in a suit wherein the city was complainant, and Isaacs, Taylor & Williams and others were defendants.   Opinion states the case.

*F. W. Christian, Pegram & Stringfellow,* and *W. W. & B. T. Crump,* for the appellants.

*C. V. Meredith,* for the appellee.

LEWIS, P., delivered the opinion of the court.

This was a suit in the chancery court of the city of Richmond, to restrain the prosecution of a number of pending actions at law against the city on certain small notes issued by

the city during the late civil war.    These notes were all under the denomination of five dollars, and were designed to circulate as currency.    Some of them were issued under an ordinance of the council, passed on the 19th of April, 1861.    The others were issued under an ordinance passed on the 14th of April, 1862.    The aggregate amount of both issues exceeded $500,000.

The statute of Virginia, at the time the first notes were issued, made it a penal offence to issue such notes.    Code 1860, ch. 198, §§ 16, 17, 19.

The bill, therefore, charges that the first series were void when issued, because in violation of this statute; and, moreover, that both series are void, because they were issued in aid of the rebellion.    And the prayer of the bill is for an injunction, and that the notes sued on be decreed to be delivered up to be cancelled.

The defendants, appellants here, answered, insisting that the first issue was legalized by an act of the legislature, assembled at Richmond, on the 19th of March, 1862, and that the second was authorized by an act of the same legislature, passed on the 29th of the same month; and they denied that either of the issues were in aid of the rebellion.

A mass of testimony was taken, which was returned by the commissioner with his report; and when the cause came on to be finally heard, the chancellor (the late Hon. Edward H. Fitzhugh), being of opinion that the case was controlled by the principles settled by the Supreme Court of the United States in *Thomas* v. *City of Richmond*, 12 Wall., 349, and *Taylor* v. *Thomas*, 22 *Id.*, 479, granted a perpetual injunction, and ordered the notes to be delivered up to be cancelled.

In reviewing this decree, we start out with the just concession by the appellants that the notes of the first series were void in their inception, because issued in contravention of the then existing law and policy of the State.    *Miller* v. *Ammon*, 145 U. S., 421; *Middleton* v. *Arnolds*, 13 Gratt., 489; *Neimeyer*

v. *Wright*, 75 Va., 239. It is contended, however, that they were afterwards legalized, and it is strenuously denied here, as it was in the court below, that the notes of either issue were intended or used in aid of the war. It is contended that they were issued to supply small change for the ordinary business transactions of the community, and for that purpose alone.

There is certainly nothing on the face of the ordinance under which the first notes were issued, or on the face of the act of March 19th, 1862, which, in terms, shows that either the city council or the legislature had in view an unlawful object. Nor is the general rule disputed that the legislative intent must be gathered from the language used by the legislature, and that the validity of a statute, unobjectionable on its face, cannot be made to depend upon the result of a judicial inquiry into the motives of the legislature; and yet we are not prepared to say that an exception to this rule does not obtain in a case where the question is whether a statute passed by the legislature of a *de facto* State government during the late war, was or was not in aid of the rebellion. The reasoning of the court in *Keith* v. *Clark*, 97 U. S., 454, would seem to favor the proposition that in such a case, when the question is properly raised on the record, extrinsic evidence is admissible to show the real object and purpose of the enactment. But it is unnecessary to decide that question, because there is another principle, thoroughly established, and which is sufficient for the purposes of the present case, and that is, that any act the necessary operation of which impairs, or tends to impair, the supremacy of the Constitution, is void, no matter what may have been the purpose of the legislature in enacting it. *Minnesota* v. *Barber*, 136 U. S., 313; *Brimmer* v. *Rebman*, 138 *Id.*, 78; *N. & W. R. R. Co.* v. *Commonwealth*, 88 Va., 95, 103. See, also, *Soon Hing* v. *Crowley*, 113 U. S., 703, 710.

The case, then, may be narrowed down to this: Were the notes in question issued and used for the purpose, as charged in the bill, of aiding in subverting the Constitution or authority

of the United States? If they were, then it was not compe-
tent for the legislature to validate them, and the effect is the
same as if they had been originally issued under a statute pro-
fessedly passed as a war measure.

In *Thomas* v. *City of Richmond*, 12 Wall., 349, in which case
the validity of the very statute we are now considering was
involved, the Supreme Court said:

"We have already decided in *Texas* v. *White*, 7 Wall., 700,
and in *Hanauer* v. *Doane*, 12 Wall., 342, that a contract made
in aid of the rebellion is void, and cannot be enforced in the
courts of this country. The same rule would apply with equal
force to a law passed in aid of the rebellion. Laws made for
the preservation of public order, and for the regulation of
business transactions between man and man, and not to aid or
promote the rebellion, though made by a mere *de facto* gov-
ernment not recognized by the United States, would be so far
recognized as to sustain the transactions which have taken
place under them. But laws made to promote and aid the
rebellion can never be recognized by, or receive the sanction
of, the courts of the United States as valid and binding laws."

Accordingly, it was held that the notes sued on in that case,
which were a part of the first issue, above mentioned, were
void, and that there could be no recovery against the city,
either on the notes themselves or on a claim for money had
and received. The latter proposition was affirmed on the
ground that persons dealing with a municipal corporation are
chargeable with notice of its powers, which are such only as
are plainly and unmistakably conferred by the law-making
power of the State, and that the city had no such authority to
issue the notes.

It is contended, however, that the present case is not con-
trolled by the decision in that case, because there the trial
court, upon evidence, perhaps, different from that in the pres-
ent case, found, as a matter of fact, that the curative statute
was passed in aid of the rebellion, which finding was not open

to review by the Supreme Court. The case was tried in the circuit court before Chief Justice Chase, who wrote the opinion, which is reported in Chase's Decisions, 551. The evidence is not fully reported, but enough appears to show that a certain memorial adopted by the city council, and afterwards presented to the legislature, praying that the notes be legalized, was admitted in evidence, and with conclusive effect, as showing the purposes for which the notes were issued. "The circumstances," said the Chief Justice, "under which the notes were put into circulation have been fully detailed by the witnesses. There was a suspension of specie payments, and doubtless one of the objects of the emission was to provide a convenient and safe circulation of notes under five dollars, and for parts of a dollar; and this certainly might be legalized. But another, and as the evidence shows, a very leading object, was to give aid and support to the rebellion. The memorial of the city council to the legislature excludes all doubt on this point. The case," he added, "is, therefore, brought directly within the principle of the decision in *Texas* v. *Chiles*, and the court is obliged to hold that no recovery can be had upon the notes."

If this memorial is admissible evidence in the present case, and we think it is, it virtually ends the case. It is not merely the testimony, nor is it the personal petition, of the individual members of the council, perhaps apprehensive of indictment for a violation of law in issuing the notes, but it is an official act of equal dignity with the ordinance itself, under which the notes were issued, and to which it refers. With respect to statutes, the rule, as announced by Lord Mansfield in *Rex* v. *Loxdale*, 1 Burr. 445, is that where there are different statutes *in pari materia*, though made at different times, they must be construed together as one system, and as explanatory of each other; and the rule is no less applicable to ordinances and resolutions of corporate bodies. It is to be remembered, moreover, that when the memorial was adopted, the notes were

confessedly void, and that the object of the memorial was, not to undo what the council had done, but to have its action legalized, as well in the interest of the note-holders as of the city.

Nor do we perceive any reason why the testimony of individual members of the council is not admissible for the same purpose. At all events, it was not objected to in the court below, and we must consider the case upon the record as it is.

In *Keith* v. *Clark*, already referred to, certain war issues of the Bank of Tennessee, which belonged to the State, were sustained, because there was no allegation or proof that the notes were issued for an unlawful purpose. It was said, however, that if they were, in fact, issued in violation of Federal authority, nothing could be easier than to plead and prove it. And in *City of Lynchburg* v. *Slaughter*, 75 Va., 57, extrinsic evidence was admitted to show the object for which certain bonds were issued by the city, under an ordinance of the council, which evidence was considered by this court, though held not sufficient to prove that the bonds were issued in aid of the rebellion.

This being so, the conclusion is irresistible that the decree of the chancery court is right.

If the evidence showed that the notes were issued and used merely to supply small change for ordinary business purposes, the case would not essentially differ in principle from *Keith* v. *Clark*. But it does not show this. On the contrary, it shows that while this was one reason for issuing them, another was to prepare, in the first instance, for the war then imminent, and, in the second, to meet the extraordinary expenses incident to the war after it had commenced.

The testimony of Mr. Grattan, a member of the council, and chairman of the finance committee, is very strong on this point. Speaking of the first issue, he says: "We had two objects in view. One was to provide a small currency for change, which was greatly needed; but the principal object was to

meet the expenses which were expected to arise out of the war"; and of the second he says: "The *only* object was to meet the expenses occasioned by the war." He then mentions, as a few of the expenses designed to be provided for, the arming and clothing of the volunteer companies of the city, the purchase of a house for the president of the Confederacy, and the building of fortifications around the city. He also says the last issue "was eagerly sought after by commissaries in the army for change, who took up the notes as fast as they could be issued."

Mr. Scott, another member of the council, testifies to the same effect, and adds: "The finances of the city required the issue of these notes, or a tax bill, which would have been too burdensome for the then condition of the people, and too dilatory in its operation."

On the other hand, two members of the council testify, as witnesses for the defendants, that the only object in issuing the notes, so far as they knew or heard, was to provide small change. But the memory of one of these witnesses, at least, is at fault; for it was on his motion that the memorial to the legislature was adopted, and which, for aught the record shows, was unanimously adopted. And as early as January, 1861, the same member offered a resolution in the council, which was afterwards passed, to sell $50,000 of city bonds to arm and equip volunteer companies. Nothing, however, was done under the resolution, as the scheme of raising money by issuing currency notes seemed preferable.

On the 4th of November, 1861, a few days before the adoption of the memorial, the president of the council submitted a report, showing that out of the proceeds of the notes theretofore issued the sum of $181,231 33 had been used for war purposes. Among these expenditures were the following—viz: $100,000 for volunteers in the Confederate service; $15,000 for defences around the city; about the same amount paid on account of a house and furniture for Mr. Davis; $50,000 invested

in Confederate bonds ; and expenditures of a similar nature, aggregating several hundred thousand dollars, were subsequently made during the war out of the proceeds of notes of both issues.

It is true the notes or their proceeds were not specially set apart as a war fund, but, like the ordinary revenues of the city, were indiscriminately used in paying the expenses of the city, both ordinary and extraordinary. But we are unable to see that that affects the case, if one of the objects in issuing the notes was to aid or promote the war.

The memorial was adopted on the 11th of November, 1861. It begins by stating that owing to the suspension of specie payments, and the political changes that had taken place, the council had been compelled to take measures " for the relief of the people, and the defense of the country against the threatened war by the United States." It then refers to the statute prohibiting municipal corporations from issuing notes to circulate as currency, and proceeds as follows :

" It seemed to the council that this law, however wise and politic when the country was at peace, ought not to be permitted to stand in the way of providing the resources which were necessary to protect our homes and defend our liberties against our ruthless and unscrupulous enemies. The council, therefore, after consulting with the governor, and obtaining his approval of the measure, determined to issue $300,000 of the notes of the city of the denominations of one and two dollars and of fifty cents."

It then goes on to show how the expenses of the city had been increased by the war, to state the expenditures that had been made in support of the war, and prays that the notes be legalized.

The ordinance under which the notes were issued was passed on the 19th of April, 1861. This, although two days after the passage of the ordinance of secession, was yet before the war is considered to have actually begun, which, in Virginia, was

not until the 27th of the same month. *The Protector*, 12 Wall., 700. The point is, therefore, made that the city ordinance was, at most, merely anticipatory of the war, and not in aid of the war. But there is nothing in this position, for the notes were not, in fact, issued until after the commencement of the war, and were then used, as it was contemplated they would be used, in aid of the war.

As to the act of March 29, 1862, under which the notes of the second series were issued, little need be said. This act shows on its face (and was, therefore, notice to all the world) that it was largely intended as a war measure, and was consequently void; for after authorizing the city of Richmond to issue its small notes to an amount not exceeding $500,000, it contains a general provision authorizing all the cities and counties of the commonwealth "to issue as currency notes or bills under the denomination of one dollar in sums equal to the amounts they may have actually appropriated *for arming and equipping their volunteers and supporting the families of those who are indigent and in service.*" This language, considered with reference to the then condition of the country, and the necessary operation of the act, leaves no room for doubt that the enactment was void *in toto.*

The appellants, therefore, are not entitled to the protection which the law throws around the innocent holder of commercial paper; nor is such a defence set up in the answers, the claim being made for the first time in the petition for appeal. "Authority to contract must exist before any protection as an innocent purchaser can be claimed by the holder"; and without such authority there can be no estoppel. *Marsh* v. *Fulton county*, 10 Wall., 676; *Burch's ex'or* v. *Fluvanna county*, 86 Va., 452; *Merrill* v. *Monticello*, 138 U. S., 673. In the present case, not only was the requisite authority to contract wanting, but the holders of the first notes presumably took them with knowledge of the law, which prohibited their issuance, and they have never been validated. In like manner the purchasers of

the notes of the second series were notified of their illegal character by the terms of the act itself, under which they were issued; so that in this particular the case is analogous to *Taylor* v. *Thomas*, 22 Wall., 479.

The case of the *City of Lynchburg* v. *Slaughter*, 75 Va., 57, is not in point. There the question was as to the validity of certain negotiable bonds issued by the city in 1864. The city was authorized by its charter to issue such bonds, and there was nothing on the face of the ordinance under which the bonds were issued to show any illegal purpose in issuing them. The defence was that the bonds were issued in aid of the rebellion; but this court held that the defence was not sustained by the evidence, and that was decisive of the case. The court, however, added the remark that, independently of this, the defence could not avail unless the plaintiff had notice of the alleged illegal purpose.

Whether the latter view is reconcilable with the decisions of the Supreme Court of the United States, one of which is *Thomas* v. *City of Richmond*, holding that any contract in aid of the rebellion is void, and cannot be enforced in the courts of this country, we need not stop to inquire, since here the holders of the notes took them, in contemplation of law, with notice of their invalidity.

Decree affirmed.