CINCINNATI, H. & D. R. CO. v. McKEEN.

(Circuit Court of Appeals, Seventh Circuit.    October 1, 1894.)

1. EXECUTED CONTRACT—ILLEGALITY—CANCELLATION.
    Where the parties are in pari delicto, an executed contract will not, as a
    general rule, be set aside because of want of authority to make it.

2. SAME.
    In May, 1887, complainant's board of directors authorized its vice presi-
    dent, I., to buy 20,000 shares of the stock of the T. & I. Railroad Co.,
    and directed the sale of certain stock of the D. & M. Railroad Co., owned
    by complainant, to provide funds' for the purchase, which stock was
    accordingly sold.    June 1, 1887, I., "trustee," entered into an agreement
    with defendant, by which defendant agreed to sell to I. 11,160 shares of
    stock of the T. & I. Railroad Co. and 4,446 shares of stock of the T. &
    L. Railroad Co., to deliver 8,560 shares of T. & I. stock and all the T. &
    L. stock on June 4th, and the remainder of the T. & I. stock in 30 days,
    and acknowledged the receipt of $250,000 from I., who agreed on June
    4th to pay $639,500, and execute his note for $669,150, with the stock
    purchased as collateral.    On June 4th the stock was delivered by de-
    fendant, and the money paid and note and collateral delivered by I.,.
    and a receipt signed by both parties acknowledging the receipt of stock,
    money, and notes.    Within the 30 days, defendant delivered the remainder
    of the stock.    June 21st, a meeting of complainant's stockholders ratified
    the sale of the D. & M. stock, with knowledge of the purpose of the sale.
    I. having been displaced as an officer of complainant, the board of
    directors passed two resolutions referring to the T. & I. stock, and
    treating it as the property of complainant, and subsequently brought two
    suits, before the present one, seeking relief based upon complainant's
    ownership of that stock.    Upon this bill, alleging that the funds paid to
    defendant by I. belonged to complainant, and seeking to set aside the
    contract of June 1st as ultra vires the complainant, to declare defendant
    a trustee for complainant of the $889,500 paid him by I., and to cancel
    the note given by I., held, that the contract had been fully executed; and
    both parties being equally chargeable with notice of its illegality, and
    no circumstances of oppression or fraud on defendant's part being estab-
    lished, it would not be set aside, nor would the note be canceled, the
    illegality of the contract being a complete defense at law, and the note
    being overdue at the commencement of this suit.

Appeal from the Circuit Court of the United States for the District
of Indiana.

Suit by the Cincinnati, Hamilton & Dayton Railroad Company
against William R. McKeen.    Defendant obtained a decree.    Com-
plainant appeals.

This suit was brought to obtain a decree declaring the defendant,
William R. McKeen, a trustee for the plaintiff, the Cincinnati, Hamil-
ton & Dayton Railroad Company and its stockholders, in respect of
certain moneys aggregating $889,500 received by him from one Henry
S. Ives, and also cancelling, as against that corporation, an agree-
ment in writing of June 1, 1887, signed by McKeen individually, and
by Ives, "trustee," and a note of June 4, 1887, given to McKeen
by Ives as "trustee," for $669,150, and payable six months after date.

The circuit court held by Judge Jenkins when district judge dis-
missed the bill for want of equity.

The case made by the pleadings and evidence is as follows:

Prior to May 30, 1887, Henry S. Ives, a vice president of the Cin-
cinnati, Hamilton & Dayton Railroad Company, an Ohio corporation,

entered upon negotiations with the defendant, William R. McKeen, who at the time was the president and a stockholder of the Terre Haute & Indianapolis Railroad Company, an Indiana corporation, for the purchase of a majority of the shares of stock of the last-named company. McKeen did not at that time, as Ives knew, own a majority of such shares, although those held by him had been sufficient to give him practically the control of that company. He also owned 4,446 shares of stock in the Terre Haute & Logansport Railroad Company, an Indiana corporation then under lease to the Terre Haute & Indianapolis Railroad Company. During the negotiations between Ives and McKeen, the latter distinctly stated to the former that some modifications must be made in that lease before he would sell his stock in the Terre Haute & Indianapolis Railroad Company, unless Ives also purchased his stock in the Terre Haute & Logansport Railroad Company.

On the 30th day of May, 1887, the directors of the Cincinnati, Hamilton & Dayton Railroad Company, at a special meeting held in Cincinnati, adopted the following resolutions:

"Resolved, that Vice President Ives is authorized to purchase 20,000 shares (par value $50 each) of the total outstanding issue of the 39,762 shares of the Terre Haute and Indianapolis Railroad Company at a price not exceeding $100 per share, and that the same shall be submitted to the stockholders of this company for ratification at the annual meeting, June 21st proximo; and, to provide for the payment of the same, it is further

"Resolved, that it is expedient that the guarantied common stock of the Dayton and Michigan Railroad Company, now owned by and held in the treasury of this company, be sold for the benefit of this company, provided that not less than one million dollars par value thereof can be sold at the present time; and that, therefore, C. C. Waite, the vice president and general manager, and F. H. Short, the assistant secretary, of this company, be, and are hereby, authorized and directed to cause the same to be sold at thirty-five dollars per share, being seventy per cent. of the par value thereof, and that the proceeds of such sale or sales be deposited in the treasury of this company," etc.

Pursuant to these resolutions, 20,500 shares of the guarantied stock of the Dayton & Michigan Railroad Company, of the par value of $1,025,000, were sold May 31, 1887, and certificates therefor were duly delivered to the purchasers.

It may be here stated that at this time the Terre Haute & Indianapolis Railroad Company, whose road extended from Indianapolis to Terre Haute, operated, under lease, a railroad extending from Terre Haute to East St. Louis, known as the "Vandalia Line;" and the Cincinnati, Hamilton & Dayton Railroad Company, whose road extended from Cincinnati, by way of Hamilton, to Dayton, owned the entire capital stock of the Cincinnati, Hamilton & Indianapolis Railroad Company, whose road extended from Hamilton, Ohio, to Indianapolis, and was connected at Indianapolis with the Terre Haute & Indianapolis Railroad by way of the Belt and Union Railway tracks. The object, therefore, of the directors of the Cincinnati, Hamilton & Dayton Railroad Company in authorizing the purchase of 20,000 shares of the stock of the Terre Haute & Indianapolis Railroad Company, must have been to obtain the control of a continuous line of railroad from Cincinnati to St. Louis.

On the 1st day of June, 1887, Ives and McKeen, pursuant to previous arrangement, met in Terre Haute for the purpose of closing up the business, about which they had been negotiating for some weeks. Ives was attended on that occasion by Mr. Ramsey, who at the time held the position of general counsel of the Cincinnati, Hamilton & Dayton Railroad Company, by Mr. Waite, vice president and general manager of that company, and by Mr. Short, a director and the secretary and assistant treasurer of the same company. McKeen was attended by his counsel, Mr. Williams. At this meeting the written agreement which the bill prays may be canceled was signed by McKeen and by Ives, after having been examined by the respective counsel of the contracting parties. That agreement was as follows:

"This agreement, made and entered into this 1st day of June, A. D. 1887, by and between William R. McKeen, of the county of Vigo and state of Indiana, and Henry S. Ives, trustee,

"Witnesseth, that the said McKeen hereby agrees to sell, assign, and transfer unto said Ives 11,160 shares of the capital stock of the Terre Haute and Indianapolis Railroad Company and 4,446 shares of the capital stock of the Terre Haute and Logansport Railroad Company, both corporations of the state of Indiana, and to deliver the certificates for such stock to said Ives, as follows, to wit:

"Certificates for 8,560 shares of said Terre Haute and Indianapolis stock and for 4,446 shares of said Terre Haute and Logansport stock on June 4th, 1887, and the remainder of said Terre Haute and Indianapolis stock, to wit, 2,600 shares, on or before thirty days from this date.

"In consideration of the premises, the said Ives has this day paid to said McKeen $250,000, and hereby agrees to pay him, on June 4th, 1887, upon delivery of the certificates of stock aforesaid, the further sum of $639,500, and also at the time last aforesaid the said Ives will execute and deliver to said McKeen a good and sufficient note for $669,150, dated June 4th, 1887, due on or before January 1st, 1888, bearing 6 per cent. interest from date, and providing for the sale and purchase of the collaterals hereinafter mentioned, in the form and upon the terms usually adopted in cases of notes secured by collateral security. The said Ives further agrees that, as collateral security for the payment of the note above described, he will on said June 4th, 1887, assign and transfer unto said McKeen certificates for 8,560 shares of the capital stock of said Terre Haute and Indianapolis Railroad Company and 4,446 shares of the capital stock of the said Terre Haute and Logansport Railroad Company, and will also, from time to time, likewise transfer and assign to said McKeen, as such collateral, any or all of the certificates for the 2,600 shares of said Terre Haute and Indianapolis which said McKeen is to deliver to him within thirty days from this date, as hereinbefore provided.

"It is agreed that, if said McKeen does not deliver any or all of said certificates for 2,600 shares within thirty days from this date as aforesaid, then the said McKeen shall pay or refund to said Ives the sum of $200 for each and every share of said Terre Haute and Indianapolis stock which he may fail to deliver within said thirty days, as liquidated damages.

"Said Ives shall neither buy, directly or indirectly, nor offer to buy, any of said stock from any other party or parties until said thirty days shall have expired.

"William R. McKeen.
"Henry S. Ives, Trustee."

At the time this agreement was executed, McKeen, as Ives had been informed, did not own as much as 11,160 shares of the stock of the Terre Haute & Indianapolis Railroad Company, and it was contemplated that he would supply the deficiency by purchase from

others within the time limited by the contract; and the last clause was inserted in order to protect him against competition with Ives in the stock market.

In part execution of the agreement, Ives paid $250,000 to McKeen on the 1st day of June, 1887. The parties, attended by the same persons, with perhaps one exception, met again in Terre Haute on the 4th day of June, 1887, on which day Ives paid to McKeen the additional sum of $639,500, and executed and delivered to the latter the note for which the above agreement provided, and which the bill prayed may be canceled. That note reads:

"$669,150.                                    Terre Haute, Ind., 4th June, 1887.

"Six months after date, or before, at my option, I promise to pay to the order of W. R. McKeen, at 25 Nassau street, New York, six hundred and sixty-nine thousand one hundred and fifty dollars, for value received, and without relief from valuation or appraisement laws, and with interest at six per cent. per annum after this date until paid; and I hereby pledge, as security to the payment of this note, eleven thousand one hundred and sixty shares Terre Haute and Indianapolis Railroad Company and 4,446 shares of Terre Haute and Logansport Railroad Company, with power hereby conferred upon the holder of this note to sell said stock, after default in the payment of this note, in such manner and at such times as he or they may deem proper, either at public or private sale, without notice. Said W. R. McKeen, or the then holder of this note, shall have the right to purchase said stock at such sale.

"Henry S. Ives, Trustee."

On the occasion of the execution of this note the contracting parties signed a paper in duplicate, of which the following is a copy:

"This is to certify that on this, the 4th day of June, 1887, pursuant to the contract of June 1st, 1887, by and between W. R. McKeen and Henry S. Ives, trustee, the said McKeen has assigned, transferred, and delivered to said Ives 8,560 shares of the capital stock of the Terre Haute and Indianapolis Railroad Company and 4,446 shares of the capital stock of the Terre Haute and Logansport Railroad Company, and has received from said Ives ($639,-500) six hundred and thirty-nine thousand five hundred dollars, and also the above-named shares of stock as collateral security for the payment of the note for ($669,150) six hundred and sixty-nine thousand one hundred and fifty dollars provided for in said contract.

"Henry S. Ives, Trustee.
"Wm. R. McKeen."

Subsequently, June 13, 1887, McKeen transferred to Ives, trustee, one certificate calling for 2,594 other shares of the capital stock of the Terre Haute & Indianapolis Railroad Company; and 6 shares of stock in the same company were transferred to parties friendly to the Ives combination, in order that they might qualify as directors.

On the 4th day of June, 1887, after the execution and delivery of the note for $669,150, and in order that the Terre Haute & Indianapolis Railroad Company might pass under the control of Ives and his associates, the request was made that the directors, except McKeen, resign, and their places be supplied by others, to be named by the new owners of the stock. The old board was accordingly convened, when Mr. Ramsey, the legal adviser of Ives and his associates, prepared an additional by-law providing that the board of directors at any meeting might fill any vacancies occasioned in the board by death, resignation, or otherwise.

This by-law being adopted, Henry Ross, a member of the old board, resigned, and in his place Frederick H. Short, a director and the secretary and assistant treasurer of the Cincinnati, Hamilton & Dayton Railway Company, was elected to fill that vacancy. He immediately qualified and took his seat as a director. Mr. Williams, another member of the old board, also retired. Short thereupon presented a resolution ordering the sale to Henry S. Ives, trustee, for the price of $62.50 per share, of 8,840 shares of the stock of the Terre Haute & Indianapolis Railroad Company, then in the treasury of the company, and standing in the name of McKeen, as its trustee. This resolution was adopted. Immediately thereafter Mr. Ramsey was elected a director, and entered upon the duties of the office. Three others of the old board then resigned, and their places were filled by the election of C. C. Waite, Henry S. Ives, and Christopher Meyer. The board consisted of Short, Ramsey, Waite, Ives, Meyer, Collett, and McKeen. To the board thus constituted, McKeen tendered his resignation as president, and, on motion of Mr. Ramsey, Ives was elected president, and immediately assumed the duties of that position.

On the same day (June 4, 1887) certificates for the 8,840 shares of stock in the Terre Haute & Indianapolis Railroad Company, in the treasury of that corporation, were, by order of the board of directors, issued to Henry S. Ives, trustee. The latter delivered the same to Short, secretary and treasurer of that company, as well as assistant treasurer of the Cincinnati, Hamilton & Dayton Railroad Company. Ives, trustee, then made a draft upon Henry S. Ives & Co., of New York, payable to the order of the Terre Haute & Indianapolis Railroad Company, for $552,500,—representing the price of the 8,840 shares at $62.50 per share,—and delivered it to Short or to the assistant treasurer of that company. By direction of Short, treasurer, the amount of that draft was simply credited to the payee on the books of Henry S. Ives & Co., of New York, who shortly thereafter failed in business. No part of the price agreed to be paid for the 8,840 shares was ever otherwise received by the Terre Haute & Indianapolis Railroad Company, or by any one in its behalf.

On the 21st day of June, 1887, at a meeting of the stockholders of the Cincinnati, Hamilton & Dayton Railroad Company, the following resolutions, offered by Mr. Short, were unanimously adopted:

"Whereas, the board of directors of this corporation, at a meeting duly held on May 30th, 1887, duly passed and adopted the following resolution, which is duly recorded in the minutes of said meeting, viz.: [Here follow the resolutions of May 30th, 1887, above referred to.] And whereas, under the foregoing resolution, the directors of the company did sell on May 31st, 1887, twenty thousand five hundred shares of said guarantied stock of the par value of $1,025,000, the certificates for which were duly delivered to purchasers thereof: Now, therefore, be it resolved, that we hereby ratify, approve, and confirm the said resolution, and the said sales of stock made thereunder, as well as all other acts done under said resolution."

The minutes of this stockholders' meeting, at which 36,307 shares were represented, make no express reference to the purchase of the stock of the Terre Haute & Indianapolis Railroad Company; but the evidence showed, beyond all question, that the stockholders present

at that meeting, with few, if any, exceptions, were aware of the fact —disclosed by the record of the meeting of the directors of the Cincinnati, Hamilton & Dayton Railroad Company of May 30, 1887— that the guarantied stock of the Dayton & Michigan Railroad Company was directed to be sold "in order to provide for the payment" of the stock of the Terre Haute & Indianapolis Railroad Company, which Vice President Ives had been previously authorized to purchase. No supposition to the contrary could be justified by any reasonable view of the facts and circumstances.

As bearing upon the inquiry whether the contract between McKeen and Ives, trustee, was fully executed before the institution of the present suit, the following additional facts may be stated:

Within a short time after the above meeting of stockholders it was ascertained that, under the Ives management, assets and securities belonging to the Terre Haute & Indianapolis Railroad Company of the value of nearly $2,000,000, as well as the 8,840 shares of treasury stock of the same corporation, had all disappeared. For what purposes they had been used is not shown. In consequence of disclosures of the dishonest practices of Ives, he was displaced as an officer of the Cincinnati, Hamilton & Dayton Railroad Company, and Julius Dexter became its president.

On the 3d day of December, 1887, the board of directors of the Cincinnati, Hamilton & Dayton Railroad Company passed a resolution "that all of the capital stock of the Terre Haute and Indianapolis Railroad Company purchased by this company in June, 1887, amounting to $1,000,000, par value, shall be transferred upon the books of the said company unto Julius Dexter, as trustee, and that said Dexter be requested to execute a certificate of trust as to said stock, as the same shall be transferred to him." A copy of this resolution was furnished to McKeen on the 18th of January, 1888. And on the same day the Cincinnati, Hamilton & Dayton Railroad Company, by its general counsel, requested in writing that the dividend of July or August, 1887, and that to be declared February 1, 1888, "upon the shares of the stock transferred to Henry S. Ives, trustee, by the Terre Haute and Indianapolis Railroad Company, on or about June 4, 1887, amounting to 8,840 shares," be withheld, "said Ives having transferred said shares, or a large part thereof, to various parties, without the authority of the Cincinnati, Hamilton and Dayton Railroad Company, whose trustee he was, and for whose benefit he held said shares."

The Cincinnati, Hamilton & Dayton Railroad Company, on the 8th day of December, 1887, commenced a suit against McKeen in the circuit court of the United States for the district of Indiana. The bill charged that prior to June 4, 1887, Ives, then vice president of the plaintiff, "was authorized by its board of directors to purchase on behalf of your orator, and as trustee for it, 20,000 shares of the stock of the Terre Haute and Indianapolis Railroad Company, a corporation having a total capital stock of less than 40,000 shares, said shares being of the par value of $50 each, at a price not to exceed $100 per share. The defendant was advised of said action of the board of directors, and of the authority of said Ives thereunder, and

thereupon sold to the said Ives, as trustee for your orator, 11,160 shares of the stock of said Terre Haute and Indianapolis Railroad Company, at the price of 200 per cent., or $100 per share, amounting to $1,116,000, and said Ives paid to the defendant on account of said purchase, out of the funds of your orator, as the defendant well knew, the sum of $889,500, leaving a balance due on account of the said purchase of $226,300."

The bill also charged that at or about the same time Ives purchased from the Terre Haute & Indianapolis Railroad Company 8,840 shares of its stock, standing in the name of McKeen, at the price of $552,500 (or $62.50 per share), and paid for the same out of the plaintiff's funds; that, as part of the transaction, Ives, without the knowledge of the plaintiff, agreed to pay McKeen individually 75 per cent. of the amount of the stock, to wit, $331,500, and also to purchase from McKeen individually 4,446 shares, of the par value of $50 each, of the stock of the Terre Haute & Logansport Railroad Company at the price of $111,150; that, to cover the real transaction, Ives, as trustee, executed to McKeen the above note, dated June 4, 1887, for $669,150, with interest at 6 per cent., and delivered the 11,160 shares of the stock of the Terre Haute & Logansport Railroad Company as collateral security for that note, with authority to Mc-Keen or the then holder to sell the said stock, as indicated in the note, in case of default in meeting it. After stating that Ives had no authority to purchase the stock of the Terre Haute & Logansport Railroad Company for or on account of the plaintiff, and that McKeen had always pretended to plaintiff, and plaintiff until recently had believed, that all of the 11,160 and 8,840 shares had been purchased from him at $100 per share, the bill alleged that the real indebtedness of the Cincinnati, Hamilton & Dayton Railroad Company to McKeen was $226,500, the balance remaining after deducting $889,500 paid by Ives from $1,116,000, the price of the 11,160 shares at $100 per share, which balance the plaintiff had offered and was willing to pay upon the return to it by McKeen of the 11,160 shares of the stock of the Terre Haute & Indianapolis Railroad Company.

The relief asked was that McKeen be enjoined from selling or otherwise disposing of said shares of stock, and that upon final hearing he be either required to accept $226,500, with interest, in full and final payment of all obligations of the plaintiff upon the said note for $669,150, to cancel that note against the plaintiff, and to deliver up the 11,160 shares of stock, or, in the alternative, that he be required to cancel that note as against the plaintiff, and return the sum of $889,500, with interest from June 4, 1887.

On the 31st day of December, 1888, while that suit was pending, the Cincinnati, Hamilton & Dayton Railroad Company brought a suit against the Terre Haute & Indianapolis Railroad Company, Ives, and McKeen, in which it alleged that it was the owner of 20,000 shares of the stock of the latter company, which had been paid for with its funds; that 11,160 shares stood in the name of Ives, as its trustee, and the certificates therefor were held by McKeen as collateral security for a sum due to him from Ives, trustee; that the amount of the balance due was in dispute; and that Ives, "without

the consent, authority, or knowledge of your orator, has wrongfully caused the residue of said 20,000 shares of stock belonging to your orator, and which were put in the name of your orator, viz. 8,840 shares, to be transferred to and unto the names of sundry persons, to your orator unknown, who are the clerks and agents of said Ives, but who nevertheless hold said stock, notwithstanding said unlawful transfers, as trustee for your orator, to whom said stock rightfully belongs." The bill in that suit also alleged that Ives was no longer an officer or stockholder of the Cincinnati, Hamilton & Dayton Railroad Company, and that Julius Dexter, its president, had been authorized to vote said stock of the Terre Haute & Indianapolis Railroad Company at its next meeting. The relief asked was a decree enjoining Ives and McKeen from voting upon said 20,000 shares of stock, and requiring the Terre Haute & Indianapolis Railroad Company to accept the vote cast thereon by Dexter for and on behalf of the plaintiff.

On the 17th day of February, 1888, the Cincinnati, Hamilton & Dayton Railroad Company dismissed the first of the above suits, and on the same day brought the present suit. In the injunction suit brought December 31, 1887, the court denied the application for a preliminary injunction, and on the 3d day of March, 1888, the plaintiff dismissed that suit.

In his answer in the present suit, McKeen denied every allegation of the bill imputing to him fraud or deception, or which implied that the sale by him to Ives was upon any other terms than those indicated in the written agreement of June 1, 1887, or under any other circumstances than we have stated. His denials have not been overthrown by the evidence in the cause.

As already indicated, the relief sought by the Cincinnati, Hamilton & Dayton Railroad Company is a decree declaring McKeen a trustee for that company and its stockholders in respect to the sums paid to him by Ives, aggregating $889,500, and canceling, as against that corporation, the written agreement of June 1, 1887, and the note for $669,150, of June 4, 1887.

C. W. Fairbanks and Lawrence Maxwell, Jr., for appellant.

Miller, Winter & Elam (Benj. Harrison and John M. Butler, of counsel), for appellee.

Before HARLAN, Circuit Justice, and BUNN and SEAMAN, District Judges.

HARLAN, Circuit Justice (after stating the facts as above reported).

The principal contention of the plaintiff is that the moneys paid to McKeen belonged to it, and, although paid by Ives for its benefit and by authority of its directors, were paid in part execution of a contract unauthorized by the plaintiff's charter or by the statutes of the state of which it was a corporation; and the same view as to want of corporate power was urged in relation to the agreement and note signed by Ives, trustee.

The defendant, among other things, insists that he did not contract with Ives as representing, nor receive the moneys in question

as coming from, or as being paid for, the plaintiff; that the contract between him and Ives was fully executed before this suit was brought; and that, under the circumstances disclosed by the evidence, a court of equity will not give the relief asked, even if it were true—which, however, the defendant denies—that the plaintiff was incompetent under its charter, or forbidden by the law of its creation, to make or to apply its funds in discharge of the agreement and note sought to be canceled.

If it be true that the plaintiff was without corporate power, under its charter or the laws of Ohio, to use its funds in the purchase of shares of the stock of the Terre Haute & Indianapolis Railroad Company or of the Terre Haute & Logansport Railroad Company, and if it be also true that McKeen, during his negotiation with Ives, knew or should be held to have known, that the latter in fact represented the Cincinnati, Hamilton & Dayton Railroad Company, and that the cash payments made by Ives were with funds belonging to that corporation,—upon which matters we express no opinion,—it does not follow that the plaintiff is entitled to the relief it now seeks.

It seems to the court that the cases of Thomas v. Railroad Co., 101 U. S. 71, 85, and of St. Louis, V. & T. H. R. Co. v. Terre Haute & I. R. Co., 145 U. S. 395, 400, 406, 12 Sup. Ct. 953, particularly the latter, are decisive of this case.

In Thomas v. Railroad Co. the court said:

"There can be no question that in many instances where an invalid contract, which the party to it might have avoided or refused to perform, has been fully performed on both sides, whereby money has been paid or property changed hands, the courts have refused to sustain an action for the recovery of the property or the money so transferred. In regard to corporations, the rule has been well laid down by Comstock, C. J., in Parish v. Wheeler, 22 N. Y. 494, that the executed dealings of corporations must be allowed to stand for and against both parties when the plainest rules of good faith require it."

St. Louis, V. & T. H. R. Co. v. Terre Haute & I. R. Co. was a suit in equity by the St. Louis, Vandalia & Terre Haute Railroad Company, an Illinois corporation, against the Terre .Haute & Indianapolis Railroad Company, an Indiana corporation, to set aside and cancel a conveyance of the plaintiff's railroad and franchise to the defendant for a term of 999 years. The principal ground upon which the plaintiff corporation sought that relief was that the lease was void for want of lawful authority in either party to enter into it. The court adjudged that the contract was clearly beyond the corporate powers of the defendant company, but deemed it unnecessary to express a definite opinion upon the question whether the contract between the parties was beyond the powers of the plaintiff, because "a contract beyond the corporate powers of either party is as invalid as if beyond the corporate powers of both."

Assuming, as contended by the plaintiff in that case, that the contract was ultra vires of the defendant, and therefore not binding upon either party, nor capable of sustaining a suit upon it at law or in equity by either party against the other, the court said:

"It does not, however, follow that this suit to set aside and cancel the contract can be maintained. If it can, it is somewhat remarkable that, in the

repeated and full discussion which the doctrine of ultra vires has undergone in the English courts within the last fifty years, no attempt has been made to bring a suit like this."

After showing that the English cases relied on were inapplicable to the case then under consideration, the court proceeded:

"The general rule in equity, as at law, is 'In pari delicto potior est conditio defendentis;' and therefore neither party to an illegal contract will be aided by the court, whether to enforce it or to set it aside. If the contract is illegal, affirmative relief against it will not be granted at law or in equity, unless the contract remains executory, or unless the parties are not in equal fault; as. where the law violated is intended for the coercion of the one party and the protection of the other, or where there has been fraud or oppression on the part of the defendant. Thomas v. Richmond, 12 Wall. 349, 355; Spring Co. v. Knowlton, 103 U. S. 49; Story, Eq. Jur. § 298. While an unlawful contract, the parties to which are in pari delicto, remains executory, its invalidity is a defense in a court of law; and a court of equity will order its cancellation only as an equitable mode of making that defense effectual, and when necessary for that purpose. Adams, Eq. Consequently, it is well settled at the present day that a court of equity will not entertain jurisdiction to order an instrument to be delivered up and canceled upon the ground of illegality appearing on its face, and when, therefore, there is no danger that the lapse of time may deprive the party to be charged upon it of his means of defense. Story, Eq. Jur. § 700a, and cases cited; Simpson v. Howden, 3 Mylne & C. 97; Ayerst v. Jenkins, L. R. 16 Eq. 275, 282. ·When the parties are in pari delicto, and the contract has been fully executed on the part of the plaintiff by the conveyance of property or by the payment of money, and has not been repudiated by the defendant, it is now equally well settled that neither a court of law nor a court of equity will assist the plaintiff to recover back the property conveyed or money paid under the contract. Thomas v. Richmond, above cited; Ayerst v. Jenkins, L. R. 16 Eq. 275, 284."

In illustration of the rule just stated, the court further said:

"In the case at bar, the contract by which the plaintiff conveyed its railroad and franchise to the defendant for a term of nine hundred and ninety-nine years was beyond the defendant's corporate powers, and therefore unlawful and void, of which the plaintiff was bound to take notice. The plaintiff stood in the position of alienating the powers which it had received from the state, and the duties which it owed to the public, to another corporation, which it knew had no lawful capacity to exercise those powers or to perform those duties. If, as the plaintiff contends, the contract was also beyond its own corporate powers, it is certainly in no better position. In either aspect of the case the plaintiff was in pari delicto with the defendant. The invalidity of the contract, in view of the laws, of which both parties were bound to take notice, was apparent on its face. The contract has been fully executed on the part of the plaintiff by the actual transfer of its railroad and franchise to the defendant; and the defendant has held the property, and paid the stipulated compensation from time to time, for seventeen years, and has taken no steps to rescind or repudiate the contract."

Has the contract which the appellant seeks to have rescinded been fully executed, or does it remain executory in any material respect?

McKeen agreed to sell and deliver to Ives 11,160 shares of the capital stock of the Terre Haute & Indianapolis Railroad Company and 4,446 shares of the capital stock of the Terre Haute & Logansport Railroad Company, certificates for the latter shares and for 8,560 of the 11,160 shares to be delivered to Ives on the 4th of June, 1887, and certificates for the remaining 2,600 shares of the stock of the Terre Haute & Indianapolis Railroad Company to be delivered 30 days from that date. All these things were done by McKeen within the time limited by the written agreement.

In consideration of McKeen's agreement to sell and deliver these shares of the stock of both the Indiana corporations, Ives, on June 1, 1887, paid to McKeen $250,000 in cash, and agreed to pay to him on the 4th of June, 1887, the additional sum of $639,500, and to execute a note dated on that day for $669,150, payable six months after date, and bearing 6 per cent. interest, and providing for the sale and purchase of the above certificates of stock in the form, and upon the terms, usually adopted in cases of notes secured by collaterals, and to assign and transfer those certificates to McKeen as collateral security for the payment of the above note. All these things were done by Ives within the time limited by the contract.

It would seem, then, that, within the meaning of the general rule to which we have adverted, the contract between the parties was fully executed on the 4th day of June, 1887. In Sturges v. Crowninshield, 4 Wheat. 122, 197, Chief Justice Marshall said that "a contract is an agreement in which a party undertakes to do, or not to do, a particular thing." And in Fletcher v. Peck, 6 Cranch, 87, 136, he said that "an executory contract is one in which a party binds himself to do, or not to do, a particular thing;" and "a contract executed is one in which the object of [the] contract is performed." Each particular thing specified in the agreement of June 1, 1887, to be done by the respective parties was done on the 4th day of June, 1887; so that a suit instituted after that day to compel its specific performance could have been dismissed upon the sole ground that nothing remained to be done which its provisions required at the hands of either party. If neither party could have maintained a suit of that character, it is not perceived upon what ground the contract between them could be characterized as executory in respect to any of its provisions. It cannot be deemed to have been executory because of the nonpayment of the note for $669,150 prior to the commencement of this suit. The written agreement of June 1, 1887, so far as it related to the balance of the price of the stock sold to Ives, after crediting the cash payments of $250,000 and $639,500, required only the execution and delivery of his note for a specified amount, containing certain provisions, and to be secured by the stock to be delivered to McKeen as collateral. Besides, under the law of the state in which the contract was made, anything may be regarded as payment which the creditor accepts as payment; and by the same law, if the note given in payment is negotiable according to the commercial law, the presumption is that it was received as payment. Weston v. Wiley, 78 Ind. 54, 56; Warring v. Hill, 89 Ind. 497, 501; Nixon v. Beard, 111 Ind. 137, 12 N. E. 131; Louden v. Birt, 4 Ind. 566; Tilford v. Roberts, 8 Ind. 254. Interpreting the agreement of June 1, 1887, in the light of the circumstances attending its execution, it cannot be doubted that the note for $669,150, secured by the stock of the two Indiana corporations, was accepted by McKeen as payment. And Judge Jenkins well said, in the present case, that, "whatever might be the rights of one who is to receive money under a contract, it cannot be that the party who is to pay in a specific manner, and has so paid by obligations satisfactory to the payee, can repudiate the transaction,

and claim the contract still to be an existing, unexecuted agreement."

If, then, the original contract now sought to be rescinded was fully executed before this suit was brought, what principle will justify the interference of a court of equity in behalf of the plaintiff? If the contract was illegal because beyond the corporate powers of the plaintiff, the parties were equal in fault,—the one for using its funds for purposes foreign to the objects of its creation, the other for accepting and appropriating such funds; both being bound to take notice of the limitations which the statutes of Ohio put upon the authority of the Cincinnati, Hamilton & Dayton Railroad Company. Nor can the assistance of a court of equity be invoked upon any ground of oppression or fraud on the part of the defendant. Neither the bill nor the evidence suggests any fact showing oppression. Fraud in certain particulars is indeed charged by the bill, but the allegations to that effect are expressly denied, and the evidence does not overcome the answer on that point. The case, then, comes within the decisions of the supreme court of the United States above cited, so far as the bill seeks, in behalf of the railroad company, a decree adjudging the defendant to hold the moneys received from Ives in trust for it.

In respect to the prayer for the cancellation of the note given by Ives, there is no need for the interposition of equity, even assuming the contract, in all its parts, to have been illegal and void as beyond the corporate powers of the railroad company. If, at the time this suit was commenced, the company was liable to suit by McKeen, either at law or in equity, upon the note itself, or for its amount as being the balance of the stipulated price for the shares purchased by Ives, trustee, the illegality of that contract would have been a complete defense. Upon the theory that the contract was ultra vires of the plaintiff, it may be that a suit in equity might have been maintained for the cancellation of the note, if one had been commenced before the note fell due, and while there was danger of its being transferred to a bona fide holder for value, without notice from the note itself or otherwise of the illegality of the contract out of which it arose. But this suit was not brought until after the maturity of the note, and therefore a transfer of it, after the institution of this suit, to a third person, would not have cut off any defense that the railroad company could have made as against McKeen, the payee.

It may be stated as part of the history of this litigation that, a few days after the present suit was brought, —that is, on the 27th of February, 1888,—McKeen notified both Ives, trustee, and the Cincinnati, Hamilton & Dayton Railroad Company, that under authority conferred by the note itself he would, at a named hour and place, on the 8th of March, 1888, sell as an entirety the stock pledged as collateral security for its payment. It was sold at the time and place designated, McKeen becoming the purchaser at the price of $750,000. Of this purchase McKeen notified the president of the Cincinnati, Hamilton & Dayton Company, as well as of the amount of the surplus in his hands over and above the face of the note.

Although the facts relating to this sale were fully set forth in the answer of McKeen, we have considered the question of the cancellation of the note in the light of the situation as it was when the present suit was brought. This we have done because it is insisted that the jurisdiction of the court to decree the cancellation of the note given by Ives depends upon the facts as they existed when that jurisdiction was invoked.

It has been suggested that these principles should not be applied to the injury of the stockholders of a corporation which has misapplied its funds in violation of its charter, or for objects foreign to those for which it was created. Whatever force this suggestion would have had if suit in the name of the corporation had been brought before the contract sought to be rescinded was fully executed, or however strongly, under some circumstances, it would appeal to the chancellor in a suit brought by or for the benefit of stockholders even after the execution of the contract, it is not entitled to weight in the present case. Although the plaintiff seeks a decree declaring that McKeen holds the $889,500, received from Ives, in trust for its stockholders as well as for itself, there is no allegation in the bill that the stockholders were not fully aware of the negotiations between Ives and McKeen, or of the use by the plaintiff of its funds for the purchase of the stock of the two Indiana corporations. We are satisfied, from the undisputed facts and from all the circumstances of the case, that the stockholders, with very few, if any, exceptions, were cognizant of Ives' movements in the interest of the Cincinnati, Hamilton & Dayton Railroad and of himself. They could not have been ignorant of the transactions of Ives and his associates, nor of the two suits instituted in the circuit court of the United States sitting in Indiana. While they remained inactive, Ives contrived to dissipate a very large amount of the assets of the Terre Haute & Indianapolis Railroad Company. So that, when this suit was brought, the stock of that company, obtained by him from McKeen, had materially diminished in value. The restoration of the parties to their original position has become an impossibility; and, while that consideration alone might not justify the court in refusing to rescind an executory contract entered into by a quasi public corporation in violation of law, it is of great weight when the extraordinary power of equity to cancel an executed contract is invoked. Delaine Co. v. James, 94 U. S. 214; Union R. Co. v. Dull, 124 U. S. 182, 8 Sup. Ct. 433. We are of opinion that the corporation, so far as it may be considered as representing stockholders, is precluded from obtaining, at the hands of a court of equity, the relief asked in the bill. St. Louis, V. & T. H. R. Co. v. Terre Haute & I. R. Co., 145 U. S. 393, 408, 12 Sup. Ct. 953; Graham v. Railway, 2 Macn. & G. 146.

For the reasons stated, the decree below is affirmed.