# First National Bank of Chicago v. City of Elgin  et al.

## Gen. No. 4,843.

1.  NEGOTIABLE INSTRUMENT—*what not.*  Special assessment vouch-
ers or bonds are not negotiable instruments.  There is no pre-
sumption that they are rightfully issued and any defenses which
would be good against the original holders thereof are good as to any
subsequent holders, innocent or otherwise.

2.  "VOUCHER"—*defined.*  The ordinary meaning of "voucher" is a
document which shows that services have been performed or ex-
penses incurred.  It covers any acquittance or receipt discharging
the person or evidencing payment by him.  When used in connec-
tion with the disbursement of moneys it implies some instrument
that shows on what account or by what authority a particular pay-
ment has been made, or that services have been performed which
entitle the party to whom it is issued to payment.

3.  LOCAL IMPROVEMENT ACT—*what not bond within meaning of.*

An instrument, notwithstanding it may contain an express promise to pay money, is not a bond within the meaning of the Local Improvement Act of 1897 where it does not conform to the provisions of such act in regard to bonds which require that the same shall be issued for the sum of $100, or some multiple thereof, and that they shall only be payable out of one installment of the special assessment which installment must be recited upon the face thereof.

4. Local improvement act—*when bond prematurely issued by city*. Bonds or vouchers given in payment of work done under a special assessment are prematurely issued where their issuance was made conditional upon the performance by the contractor of a particular condition which was not performed.

5. Local improvement act—*who authorized to accept work done under special assessment.* The county court and not the city is the proper authority to accept work done pursuant to a special assessment.

6. Mechanic's lien—*when notice of subcontractor to city given in time.* A subcontractor who serves notice upon a city of his claim before a lawful and proper delivery of bonds or warrants in payment has been made by the city to the contractor, is in time.

7. Mechanic's lien—*who cannot question notice of subcontractor given to the city under section 23.* It is only the city who can raise the question that a subcontractor has not served his notice of claim within the proper statutory time.

8. Mechanic's lien—*how costs apportioned in.* By virtue of section 17 of the Mechanic's Lein Act, it is made the duty of the court upon the determination of a mechanic's lien proceeding equitably to apportion the costs among the parties litigant.

9. Jurisdiction—*when equity will take, to settle entire controversy.* Where conflicting claims are before a court of equity for determination, such court will settle and adjudicate all claims notwithstanding one of the parties declares that he does not ask affirmative relief but only wishes to be dismissed and left to enforce his rights in some other manner.

Bill in equity. Appeal from the City Court of Elgin; the Hon. John L. Healy, Judge, presiding. Heard in this court at the April term, 1907. Affirmed in part, reversed in part and remanded. Opinion filed October 10, 1907.

**Statement by the Court.** On December 22, 1904, McClure & Struckman, partners, began this suit by filing a bill in equity against the City of Elgin and others for a subcontractors' lien under section 23 of the Mechanic's Lien Law of 1903, which as to the matters herein involved is

substantially the same as section 24 of the Mechanic's Lien Law of 1895. The lien was claimed for work done upon the improvement of a street. The defendants were the city of Elgin, the original contractors, various other subcontractors, the Home National Bank of Elgin and the First National Bank of Chicago. Other subcontractors filed consolidated answers and cross-bills claiming like liens. The city answered, admitting that it held $5,902.68 for the benefit of whoever might be entitled to it. The Home National Bank filed an answer and a cross-bill, claiming a lien upon the fund left after the payment of the subcontractors, by virtue of a certain order for $8,000. The First National Bank of Chicago answered and filed a cross-bill and an amended cross-bill claiming all the moneys in the hands of the city of Elgin, by virtue of five certain vouchers for the total sum of $16,640.67. During the hearing the First National Bank dismissed its original and its amended cross-bill. There was an order by agreement that the cross-bills of the subcontractors might be treated as denied, without formal answers. The cause was referred to a master to take and report proofs and conclusions. He reported his proofs and conclusions, after amending his report under certain objections and after overruling certain objections filed by the First National Bank and by others. The master allowed the claims of liens of certain subcontractors and rejected those of others. A decree was thereafter rendered overruling exceptions by said First National Bank. The decree found that the total sum remaining due from the city upon the contract price was $5,902.68 and directed that the costs first be paid therefrom, and second, the sums found due certain subcontractors, and third, that the balance be paid to the Home National Bank; and that said five vouchers referred to in the answer of the First National Bank be delivered up and cancelled, and that upon the city of Elgin complying with the decree requiring it to proceed to make said sum available for distribution, under the local improvement act, it should incur no further liability. The decree provided that certain particular items should be taxed as

costs, and the correctness and propriety of those allowances are not questioned here by any of the parties. The First National Bank appeals and assigns errors. No cross errors are assigned.

In March, 1903, the city of Elgin adopted an ordinance for the improvement of Grove avenue in said city, between the south line of Chicago street and the north curb line of National street by grading and paving it with asphalt on a concrete foundation so as to produce a pavement which during the period of ten years next after its completion will be sound and in a smooth condition for travel, and whose wearing surface during said period shall lose not to exceed 30 per cent in thickness, either by compression or abrasion or both. The ordinance contained minute details for the construction of the work. It provided for a special assessment upon the property to be benefited thereby, divided into ten instalments. Thereafter, on July 25, 1903, the New Century Paving Company and the Federal Asphalt Company entered into a contract with the city of Elgin to improve said street under said ordinance for the sum of $29,427.68, of which the city was to pay $7,000 by general taxation and the rest by special assessment, as provided by law. The contract contained a provision that the contractors should make no claim against the city for assessments against the property benefited, except from the collection of special assessments. It also provided that estimates would be issued to the contractors during the making of the improvement for 85 per cent of the value of the work done. Said contract expressly referred to the act concerning local improvements in force July 1, 1897, as amended, and contained the following paragraph: "It is expressly understood and agreed that all assessments and vouchers therefor, and bonds issued against the same, and all vouchers or bonds for work issued to the party of the first part, shall only be paid when the assessment or assessments levied, and which may hereafter be levied for said improvement, shall be collected as provided by said Act of the General Assembly of the State of Illinois entitled as set forth, as now amended, and that said vouchers

and bonds, and interest thereon, shall be payable only from special assessment or assessments, and out of no other assessments or fund whatever, and that all vouchers or bonds, and interest thereon, for part of any installment, shall only share *pro rata* with the vouchers or bonds and interest thereon, for the remaining part thereof."

The New Century Paving Company at some later date ceased to be actively interested in the performance of the contract, and the actual work seems to have been mainly done by the Federal Asphalt Company. The contractors entered upon the work, and ceased work about December 1, 1903. As to the manner in which the contractors performed the contract, the master found as follows: "That in proceeding with the work of construction they divided said Grove avenue into a series of sections, commencing with that portion of said Grove avenue immediately adjoining the south line of Chicago street in said city of Elgin; that they pursued said work of construction by laying the wearing surface first on one side of the street in each of said sections and then by laying it on the other side of the street therein; that they enclosed the said sections by placing barriers in said street at each end of said sections; that as they continued with the work they proceeded from one section to another in a southerly course along said Grove avenue; and that from time to time as they continued with said work and passed from section to section as aforesaid, the said contractors took down and removed the barriers previously erected by them, and threw open to public use and travel the respective sections from which the said barriers were by them so removed; that within a day or two after the said sections of the street had been thrown open to public use as aforesaid, the same showed defects and began to break and become loose and crumble; and that subsequently the entire wearing surface of the pavement so laid by said contractors became broken all the way down said Grove avenue; that wherever said Grove avenue was used for public travel the wearing surface so laid thereon cracked and ground away; that, as said wearing surface continued to crumble and grind

away, holes, varying in length from three feet to three rods, formed therein and extended in depth down to the concrete foundation upon which said wearing surface had been laid, and in such places left said concrete foundation entirely uncovered and exposed to view; that as the said contractors proceeded with the said work, the said holes so exposing the concrete foundation continually became larger and more numerous in the several sections upon which said wearing surface had been placed, and that before said contractors were half way down said Grove avenue with their said work of construction several such holes appeared in the north end of said Grove avenue and there remained; that in fact such holes formed and remained throughout the entire length of the wearing surface placed by said contractors on said Grove avenue; that as said surface became broken and worn down as aforesaid, through crumbling and grinding away as aforesaid, it formed into small particles and dust and was blown away by the wind; that a portion of said wearing surface was by the said contractors put on during freezing weather, and that the work of laying the last portion of said wearing surface was done by them during a snowstorm in the month of November, 1903; that they never attempted to finish the pavement of said Grove avenue; that the said contractors discontinued their work on said Grove avenue on or about December 1, 1903; that at the time that said contractors discontinued their said work on said Grove avenue as aforesaid numerous holes of the kind aforesaid still remained in the wearing surface so laid by them on the concrete foundation in said Grove avenue; that in the fall of the year 1903 and at some time prior to the month of December, 1903, the superintendent of said Federal Asphalt Company and the president of said New Century Paving Company stated to the mayor and the city engineer of the said city of Elgin that the said contractors would come back the following spring and finish the work on said improvement; that as a matter of fact said contractors never did return to do any further work in the matter of said improve-

ment, and never did perform any further work thereon after said first day of December, 1903."

Thereafter the board of local improvements petitioned the County Court for authority to relet the contract to complete the street according to the ordinance, and upon a hearing in the County Court obtained an order finding that the contract had not been performed, and giving authority to contract to finish the work and, after notice to the original contractors and to the First National Bank, it advertised for bids and relet the contract to The Thomas J. Peter Company for $20,750. That company completed the street pursuant to contract and was paid the contract price, either in money or in bonds against the special assessment. The difference between the original contract price and the price in the second contract was $8,677.68. There had been paid to the original contractors, including a certain item of $225 concerning the use of a roller, $2,775. The difference between these two items is $5,902.68, the amount for which the city admits liability and which was distributed by the decree.

The character of the five instruments now held by the First National Bank is a material question in this case. They are known herein as Exhibits "A" to "E" inclusive. Exhibit "A" is named therein as "voucher No. 23," and certifies that the contractors "are entitled to this voucher on contract for paving Grove avenue with asphalt from Chicago street to National street, $2,260, and is payable out of the first instalment of special assessment No. 1477 when collected and not otherwise." Exhibit "B" is named therein as "voucher No. 24," is for $4,225, and of like terms with Exhibit "A." Exhibit "C" is headed "Special Assessment Voucher," is dated November 3, 1903, and the approval thereof November 7, 1903, is payable from the first, second, third, fourth, fifth, sixth and seventh instalments of the special assessment; is for $3,060 "with interest thereon except the first instalment, at the rate of 4 per cent per annum." Exhibit "E" is headed "Special Assessment Voucher," is dated November 3, 1903, and approved November 7, 1903,

payable from the second, third, fourth and fifth instalments and is for $5,395.67 with interest at 4 per cent per annum. Exhibit "D," which was the last one of the five issued, and which is substantially the same in tenor as Exhibits "C" and "E," is as follows:

"SPECIAL ASSESSMENT VOUCHER.

ORIGINAL.

Office of

BOARD OF LOCAL IMPROVEMENTS,

Installment Plan

Streets

Department No. ...........
Comptroller's No. .........
Sp'l Ass't Warr't No. 1477.
Installments No. 5 & 6.
Estimate No. 4.

Elgin, Ills., November 17th, 1903.

The city of Elgin will pay from the fifth and sixth installments of the Special Assessment Warrant above mentioned, on the 2nd day of January, 1908 and 1909, after the completion and acceptance of the work, or when and as said installment or assessment is collected and in the city treasury, but from no other assessment or fund, to the New Century Paving Company and The Federal Asphalt Company or order, the sum of seventeen hundred dollars, with interest thereon at the rate of four per cent per annum from date hereof, payable annually or when and as thereafter collected and in the city treasury. This voucher is given under the provisions of that certain act of the General Assembly of the State of Illinois, entitled 'An Act Concerning Local Improvements,' approved June 14, 1897, and in force July 1, 1897 (and the amendments thereto), and is issued in part payment for work, labor and materials, done, performed and furnished, in accordance with a certain contract with the city of Elgin for improving Grove avenue in said city of Elgin by paving with asphalt laid on a five-inch concrete foundation.

The assessment against which this voucher is issued was made by the city of Elgin and was confirmed by the County

Court of Kane county, Illinois, on the 20th day of May, 1903.

By accepting this voucher the holder thereof expressly agrees that the city of Elgin shall and does have the right to pay the whole or any part thereof at any time after the date hereof. The agreement of the contractor accepting this voucher as hereafter appearing, is hereby made a part of this voucher. This voucher is exchangeable for cash or bonds as provided by law and the ordinance providing for said improvement.

I hereby certify that the work and materials for which this voucher is issued have been duly inspected, accepted and found to agree with contract and specifications, and that the amounts paid and the balance due as above are correct.

C. A. PROUT,

Assistant Engineer in Charge of Work.

Approved,

E. P. Gerry,
Supt. of Streets.

Approved,

Henry Dakin,
Engineer Board of Local Improvements.

Amount due for work since last estimate........$2,000.00
Less reserve, of 15%....................... 300.00
Less previous vouchers issued.................
Less vouchers to be issued on other installments...

Net amount due on this estimate.............$1,700.00

Approved for payment November 17, 1903.

BOARD OF LOCAL IMPROVEMENTS.<br>A. H. Hubbard,<br>President.<br>Henry Dakin,<br>Secretary.<br>A. H. Hubbard,

(SEAL)
Mayor.<br>Wm. F. Sylla,<br>City Clerk.

The issuance of this voucher is expressly authorized by the

city council of the city of Elgin, by its action at the meeting thereof, held on the 17th day of November, 1903.

A. H. Hubbard, Mayor.<br>
Wm. F. Sylla, City Clerk.

In consideration of the issuing of this voucher we, and each of us, hereby, for ourselves, our successors, heirs, executors, administrators and assigns, accept the same in full payment of the amount herein stated, and relinquish any and all claims or liens we, and each of us, may have against the city of Elgin for the work mentioned herein, or for the payment of this voucher, except from the collection of the Special Assessment Warrant herein named.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(Indorsed on back.)                    Contractors."

"This voucher is assigned to the First National Bank of Chicago this 18th day of November, 1903.

Federal Asphalt Co.   By. M. D. Coffeen, Prest., Legal Holder.

New Century Paving Co.   By H. B. Cook, Asst. Treas."

The figures "1477" appearing on the heading of this voucher are not the number of the document, as might be inferred, but they are the numerical designation of the special assessment for the improvement of Grove avenue. Exhibits "C" and "E" have no such number upon them.

The order upon which the claim of the Home National Bank is based, is as follows:

"Chicago, Ills., Nov. 27, 1903.   To the Mayor, Board of Public Works and Common Council of the City of Elgin, State of Illinois.

You are hereby authorized and ordered to pay to the Home National Bank of Elgin the sum of $8,000 out of any and all moneys, vouchers and warrants now due or to become due to the Federal Asphalt Co. or the New Century Paving Company under their contract with the said city of Elgin for the improvement of Grove avenue in said city.

Federal Asphalt Co.<br>
By M. D. Coffeen, Prest.<br>
New Century Paving Co.<br>
By A. Mahnus, President.

Accepted, A. H. Hubbard, President of the Board of Local Improvements.

A. H. Hubbard, Mayor of the City of Elgin.
Nov. 27th, 1903."

WILLIAM M. PINDELL and PERLEY H. BISHOP, for appellant.

BOTSFORD, WAYNE & BOTSFORD, CHARLES B. HAZLEHURST, CHARLES L. ABBOTT, ELWOOD E. KENYON, FISHER & MANN, JOHN A. RUSSELL, ROBERT S. EGAN, E. C. LUTHER, D. B. SHERWOOD and DOLPH, BUELL and ABBEY, for appellees.

MR. JUSTICE DIBELL delivered the opinion of the court.

The First National Bank of Chicago, appellant, is not an innocent purchaser of negotiable paper for value without notice. Whether the paper it holds, Exhibits "A" to "E," inclusive, are certificates, vouchers or bonds, they are not negotiable instruments, and the bank holding them has no greater rights than the contractors to whom they were issued. There is no presumption that they were rightfully issued. The holder occupies the same position as the contractors. Any defense good against the contractors is good against the holder of such paper. If any defense thereto or any defect therein exists, because of the fraud or wrong of the contractors in failing to put in the pavement which the ordinance specified, the holder of the paper is equally affected thereby. National Bank of LaCrosse v. Petterson, 200 Ill., 215; Morrison v. Austin State Bank, 213 Ill., 472; Northern Trust Co. v. Village of Wilmette, 220 Ill., 417.

The city occupies the position here of the owner in an ordinary mechanic's lien suit. It is the party to pay. It does not here dispute the correctness of the decree awarding prior liens to the subcontractors. Appellant is the only one here questioning that portion of the decree which is in favor of the subcontractors. It is not claimed by appellant that the sums awarded the subcontractors are excessive or that there is any lack of proof to support the decree in their

favor, except the alleged failure of the subcontractors to give notice to the city of their claims in time. Section 23 of the Lien Law gives a subcontractor on a public improvement "a lien on the money, bonds, or warrants due or to become due such contractor for such improvement: provided, such person shall, before payment, or delivery thereof is made to such contractor notify the officials of the  *   *   *  city or municipality whose duty it is to pay such contractor, of his claim by a written notice." The subcontractors gave notices to the proper officials, but these notices were not given until after Exhibits "A" to "E" inclusive were received by the contractors and by them assigned to appellant. These documents, Exhibits "A" to "E," inclusive, were not money. Were they bonds or warrants within the meaning of the lien law, and was it necessary to entitle the subcontractors to liens that they should serve their notices upon the officials of the city before said documents were received by the contractors?

Section 88 of the Local Improvement Act of 1897, as amended, provides that payment for any improvement under that act, to be paid out of any special assessment levied in instalments as therein provided, may be made in the bonds in said article provided for and that if the first instalment is not collected when payments fall due, vouchers therefor may be issued payable out of the first instalment when collected, and that said vouchers shall bear no interest and shall be paid from the first instalment when collected. Section 86 provides for the issue of bonds by such city payable out of the second and succeeding instalments, bearing interest at the rate of 5 per cent per annum, payable annually, and sion ⌐ by such officers as may be prescribed by ordinance; w       bonds shall be issued in sums of $100 or some mul-
t⸳       thereof. It requires that each bond shall state on its
f⸱      out of which instalment it is payable, and that the
b·       shall be divided into as many series as there are de-
fc·    l instalments. A form for the bond is given. That
fc⸱    plainly indicates that each bond is to be drawn against
a     gle instalment to be specified in the bond. Said section

National Bank v. City of Elgin.

86 also permits payment of a voucher or bond out of any instalment having a surplus to its credit, other than the instalment against which it is drawn. Section 91 provides for payments from time to time as the work progresses, upon certificates by the board of local improvements or by some officer designated by said board, which payments "may be made either in money, vouchers or bonds, as herein provided."

The ordinary meaning of "voucher" is a document which shows that services have been performed or expenses incurred. It covers any acquittance or receipt discharging the person or evidencing payment by him. When used in connection with the disbursement of moneys it implies some instrument that shows on what account or by what authority a particular payment has been made, or that services have been performed which entitle the party to whom it is issued to payment. It vouches for the truth of accounts or estimates. After a note or a bond has been paid or cancelled or taken up, it becomes a voucher in the hands of the party paying it. In no proper sense can an instrument for the payment of money be called a voucher while it is outstanding and unpaid. It is doubtful whether this distinction has been fully observed in the use of the word "voucher" in this statute. It seems to be intended by the sections above referred to that vouchers shall be issued only against the first instalment provided for in the local improvement act, and then only when payments on the contract fall due and the first instalment has not been collected. These vouchers were intended by the statute to be informal papers bearing no interest, and having no special form prescribed. Exhibits "A" and "B" are obviously vouchers within the meaning of the statute. They are certificates that the contractor is entitled to a certain sum out of the first instalment of the special assessment when collected and without interest. They do not contain any promise to pay any money. They are not accompanied by any estimates or certificates of the board of local improvements, as the statute seems to contemplate. Exhibits "C," "D" and "E" do not conform to the defini-

tions we have given of a voucher, nor do they comply with the requirements of section 86 as to the contents of the bonds which the city is authorized to issue. They are drawn against a number of different instalments, while the bond is to be drawn against a single instalment. They are not in sums of $100 or a multiple thereof. They are not drawn in the form prescribed by that section. They profess in their heading and in the language in the body thereof to be vouchers and not bonds. They are described as vouchers in the assignments thereof to appellant. Each of them contains a provision that it is exchangeable for bonds as provided in the law and the ordinance. That strongly shows that they were not issued as bonds. We conclude that it was not the intention of the city to issue these documents as bonds, but as temporary papers evidencing the amount of the respective estimates then made, notwithstanding the fact that they contain an express promise to pay money. If these exhibits are not bonds neither are they warrants within the meaning of the lien statute; and there had been no payment or delivery of money, bonds or warrants to the contractor at the time the subcontractors gave the city notice of their claim for liens. If there had been no such delivery, then the subcontractors gave the notice in time, and the court properly recognized their rights to liens. Appellant calls each of its five exhibits "vouchers" in all its pleadings in this case, namely, in its answer to the original bill and to the cross-bill of the Home National Bank, and in its own cross-bill and amended cross-bill.

But if exhibits "C," "D" and "E" should be regarded as promises to pay money, and the distinction between them and bonds treated as unimportant, still these instruments were irregularly issued. If they were intended to be bonds or to be issued under the authority of section 86, they failed in almost every particular to comply with that section. Moreover, it was intended, as appears by section 85 and other provisions of the act, that the Board of Local Improvements should cause the work to be carefully inspected during its progress and that the contractors should comply

fully with the contract and specifications.   The order of
the County Court, in a matter within its jurisdiction (People v. Cohen, 219 Ill., 200; Case v. City of Sullivan, 222
Ill., 56), establishes, as against the original contractors, and
therefore as against appellant, that the contract had not
been performed.   But if that order is not conclusive, still
the oral proof on that subject (wholly omitted from appellant's abstract) justified the finding by the master, set out
at length in the foregoing statement, which shows that before any of these instruments were issued to the contractors,
it was clear that the work done entirely failed to comply with
the contract.   Moreover, appellant, in its answer to the cross-
bill of the Home National Bank, admitted that the original
contractors failed to complete the work according to con-
tract, though in its answer to the original bill it professed
to be not informed on that subject, and in its amended cross-
bill it declared that the contract had been substantially per-
formed by the original contractors.   In the exceedingly de-
fective condition in which the work then was, no instruments
attempting to bind the city to pay the contractors ought to
have been issued.   The vice-president of appellant was a
heavy stockholder in the Federal Asphalt Company, and he
was present at an interview between the mayor and the presi-
dent of the Federal Asphalt Company in which the defects
in the work were discussed and assurances were given by the
contractors to the mayor that the work was all right (when
in fact it was in a very defective condition), coupled with a
promise that the contractors would make it right or complete
it the following spring.   The latter was a mere promise;
but the mayor in that interview told the contractors, that he
was no judge of such work, and the assurances of the char-
acter of the work then done, given by the contractors to the
mayor at that time, were unfounded under the proofs.   It
was because of these statements and assurances that the
mayor was induced to cause these documents to be issued
to the contractors, and appellant purchased these instruments
afterwards.   Moreover, Exhibits "C," "D" and "E" show
on their face that to make them complete the contractors were

required to sign a certain agreement attached to each of said exhibits, which was in express terms made binding upon themselves, their successors, heirs,. executors, administrators and assigns. Perhaps it was unnecessary to require such an agreement from the contractors, but the city and board of local improvements had a right to require such an agreement from the contractors as a part of the voucher, if they saw fit, and they did require it, and wrote that requirement into each of the three vouchers. The contractors did not sign these agreements. These three vouchers therefore were incomplete, and the act of the mayor in placing them in the hands of the contractors was for that further reason premature and ineffective, and there was no delivery of them as completed instruments. That was obvious upon the face of the instruments when received by appellant. They are just as incomplete in the hands of appellant as if the contractors still held them and were seeking to enforce them. We think it clear that they were improperly issued, and that section 23 of the lien law means that the subcontractor shall give notice to the city before a lawful and proper delivery of bonds or warrants to the contractor, and that the subcontractor should not be deprived of his lien by the act of the city in issuing instruments to the contractor at a time when he was not entitled to receive them. If the mayor and other officers of the city had withheld these documents from the contractor until the state of the work entitled him to receive them, they would not have been delivered when the several subcontractors served their notices upon the city. We therefore hold that the notices were in time.

But there is another view of this subject. The provision of section 23 of the lien law requiring subcontractors to notify the city officials of their claims before the money due the contractor is paid to him, or the bonds or warrants are delivered to him, is enacted for the benefit of the city, and to prevent any effort to impose a further liability on the city after it has paid its money or delivered up its bonds or warrants therefor. But the city does not complain here of any lack of notice. The contractors owe these subcontrac-

tors. The work and materials for which the subcontractors sought liens were upon the foundation of the improvement, and that foundation was laid according to the contract and was not defective. Why should the original contractors be heard to question the notice given by the subcontractors? The provisions of section 23 of the lien law were not inserted for the benefit or protection of the original contractors. We question whether they could be heard to make this defense against the subcontractors. Appellant stands in the shoes of the original contractors and has no greater rights than they. For these various reasons we conclude that the decision of the court below properly directed the payment of the subcontractors out of the fund remaining unexpended in the hands of the city.

Appellant contends that the court had no jurisdiction except to dispose of the claims of the subcontractors to liens, and that there was no pleading which authorized the court to determine the other matters covered by its decree. The cross-bill of the Home National Bank gave the court jurisdiction to determine whether that bank was entitled to the surplus which would be left after the liens of the subcontractors were discharged, and that made it necessary for the court to adjudicate upon the character and effect of the five vouchers set up and relied upon by appellant in its answer to the cross-bill of the Home National Bank. In its answer to the original bill also appellant alleged that it had a lien upon the fund. It is obvious that under its cross-bill the Home National Bank is entitled to the balance of the fund unless appellant is entitled to the whole or some part thereof by virtue of its five vouchers. Therefore the court was compelled to adjudicate upon the rights of appellant. Appellant contends that the court should have found that none of the subcontractors were entitled to liens, and that the lien of the Home National Bank was subordinate to that of appellant, and that appellant's lien exceeded the amount of the fund, and should then have dismissed the bill and all the cross-bills, and should have left appellant to enforce its five vouchers in such way and manner as it might hereafter select.

It may well be that, if the court had so found the facts, it would have been its duty to dismiss the bill and all the cross-bills, and thus leave appellant to pursue its own course hereafter. But when the court determined that the subcontractors were entitled to prior liens and that the Home National Bank was entitled to a lien, it then became necessary for the court to settle the rights of all the parties. If the court had found that appellant was entitled to some portion but not to all of the surplus left after the subcontractors were paid, it would have been compelled to decide the amount to which it was so entitled and to have fixed that amount in its decree, notwithstanding that appellant did not ask or desire any affirmative relief, but only to be let alone to enforce its vouchers hereafter as it saw fit. The necessity of acting upon the claims of appellant, as incidental to and inseparable from the relief sought by the subcontractors and by the Home National Bank, is sustained by the principle underlying Dillman v. Will County National Bank, 138 Ill., 282, and Rock Island National Bank v. Thompson, 173 Ill., 593, 612. When a court has obtained such jurisdiction the other parties have a right to have the entire matter in controversy settled in the pending equitable proceeding, notwithstanding a party to whom something may be found due and who claims the whole fund, declares that it does not ask any affirmative relief but only wishes to be dismissed and left to enforce its rights in some other manner.

The master's report against appellant, as between it and the Home National Bank, seems to be based chiefly upon the theory that by the course of appellant's counsel in stating to the master that it did not desire any affirmative relief, the master was precluded from finding in appellant's favor. We think this conclusion unsound, and that such disclaimer did not enlarge the rights of the Home National Bank, and that if anything was justly due appellant out of said fund, the state of the case required the master to so decide and the court to so decree.

In assailing the vouchers held by appellant the Home Na-

tional Bank seems to us to have overlooked the fact that its order for $8,000 is subject to similar criticisms.

When that order was issued and accepted by the mayor in his dual capacity as mayor and president of the board of local improvements, the work under the contract was unfinished and in a very defective condition. The contractors had no right to have any payments made to them then nor to receive any bonds, warrants or orders of any kind. The power to determine whether the improvements had been completed in compliance with the contract so as to authorize the issue of bonds had been vested in the County Court by section 84 of the act as amended in 1903. Case v. City of Sullivan, *supra*. The mayor had no authority to bind the city by an acceptance. He ought not to have attempted to accept the order. The master found that the Home National Bank, when it received the order, knew the defective condition of the street. It ought not to have attempted to bind the city by an acceptance by the mayor. We conclude that the instruments held by appellant and by the Home National Bank were all irregular and were irregularly obtained, and that nothing has occurred to give the one any preference over the other in the distribution of the surplus and that it should have been divided *pro rata* between the two banks upon the amounts named upon the face of their respective papers.

The court directed that the costs should first be paid out of the fund. Section 17 of the lien act provides that the costs shall be taxed equitably against the losing parties. The decree in that respect was beneficial to appellant, in the view the court took of its rights, as appellant lost everything and no costs were adjudged against it. But as we now determine that appellant is entitled to a part of the fund, it becomes necessary to direct how the costs of the court below should be apportioned. The following parties filed answers and cross-bills, claiming liens for the amounts stated, and were entirely defeated, viz.: George S. Chisholm, $1,577.67; R. G. Early, $577.92; Moore & Hawkins, $501.36; and McClure & Struckman, who filed the original bill, were al-

lowed less than their claim of lien by $251.34. They were "losing parties" in the total sum of $2,908.29 and we see no reason why section 17 of the lien law does not require that they pay a part of the costs. The Home National Bank and appellant are also losing parties in large sums, the latter in about double the amount of the former. We accordingly direct that $50 of the costs of the court below should be taxed against and paid by Chisholm, Early, Moore & Hawkins and McClure & Struckman, in proportion to the several amounts claimed and lost by them as above stated; and that the rest of the costs of the court below and all the costs of this court be paid as follows: one-third by the Home National Bank and two-thirds by appellant. The additional abstract filed by the city of Elgin will be taxed as costs.

The decree provided that appellant's five vouchers should be delivered up and cancelled as against the city of Elgin. The assignment of these vouchers by the original contractors may have bestowed upon appellant some rights against the original contractors, and for the purpose of enforcing those rights, if any, it ought to be permitted to retain said vouchers. For the same reason the Home National Bank ought to be permitted to retain its order. But the decree should definitely provide that the city of Elgin and the fund arising from the special assessment under this ordinance and under these contracts shall be relieved from all further liability, both to appellant and to the Home National Bank, and also to all other parties to this suit.

So much of the decree of the court below as is in favor of the subcontractors, and so much as directs what shall be included in the costs, is affirmed; and in all other respects said decree is reversed; and the cause is remanded with directions to enter a decree pursuant to this opinion.

*Affirmed in part, reversed in part, and remanded.*