**GETZ v. CITY OF HARVEY et al.**
**GETZ v. CITY OF HARVEY.**

Nos. 7411, 7481.

Circuit Court of Appeals, Seventh Circuit.

Feb. 28, 1941.

Rehearing Denied April 7, 1941.

Samuel K. Markman, Thomas C. Donovan, and John P. Sullivan, all of Chicago, Ill. (Henry O. Nickel, of Chicago, Ill., of counsel), for John G. Getz, Jr.

John J. Dowdle, of Chicago, Ill., for City of Harvey.

Before SPARKS and KERNER, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

In 7411, the plaintiff and, in 7481, the defendant, City of Harvey, appeal from a judgment rendered in an action wherein plaintiff, claiming to be the owner of water fund certificates issued by the City of Harvey, a municipal corporation, in the face amount of $243,000, sought an accounting for diversion and misapplication of funds applicable to the certificates, an injunction restraining defendant from further depletion of such funds and restoration of all illegally diverted. Answering, defendants denied validity of the certificates and asserted in the alternative that, if valid, they should be held subject to a trust in their behalf by virtue whereof the city had the right to compel surrender of plaintiff's certificates upon payment of what the brokerage firms of A. C. Allyn & Company and Stifel, Nicolaus & Company had paid for them, namely, 70 cents on the dollar. This purchase had been made, as defendants claimed, in pursuance of a contract with the city, whereby A. C. Allyn & Company was bound to deliver such certificates as it might purchase to the city at the price at which it might acquire them. Defendants averred further in this connection that the certificates are not, under the laws of Illinois, negotiable instruments and that plaintiff, a subsequent purchaser, was bound to take notice of the alleged rights of the city. Plaintiff, in his reply, denied knowledge of any alleged conspiracy or implied trust and asserted that the bonds had been purchased by his immediate assignor at 100 per cent of their par value and that he, as a bona fide purchaser, had succeeded to all the right and title therein and thereto, subject to no defense. He replied also that the certificates had been issued properly and constituted binding obligations according to their terms and provisions.

Upon hearing the report of the master, to whom the cause had been referred, the District Court on May 23, 1940, entered judgment, directing that plaintiff deposit, within thirty days, certificates of the par value of $243,000, with the clerk, and that the city deposit, also within thirty days, the sum of $173,300 the amount actually expended by Allyn & Company and its associates in the purchase of these certificates and sufficient funds to satisfy the interest upon this purchase price, the aggregate amount being $203,795.19, for the use and benefit of plaintiff. The court further ordered that if the city should fail to comply, judgment be entered against it in favor of plaintiff for the latter sum.

From this judgment plaintiff appeals, insisting that the proof shows that defendants were guilty of wrongfully depleting the assets of the water department in the sum of $343,523.07 and of diverting moneys from that department in the amount of $146,973.31; that it was the city's duty as trustee to distribute promptly the funds, as collected, to the certificate holders; that the alleged contract between the city and one O'Brien, agent, as defendants claim, for Allyn & Company, for refunding these and other certificates, was unauthorized and illegal; that the city had no right to purchase certificates in the market; that the court wrongfully ordered plaintiff to surrender his certificates upon payment of 70 per cent of their face value plus interest; that any equities arising out of contracts of the city with O'Brien or Allyn & Company, being unknown to plaintiff, affect in no way his rights; that the alleged contract for refunding never became effective; that if the certificates were improperly issued, the city is estopped to complain, and that the court erred in failing to direct restorement of the diverted funds and payment of plaintiff, according to his statutory rights and priorities, and in various other respects.

In 7481 the city appeals, averring that the city was without legislative power to issue the certificates involved and is not estopped to assert this defense. The questions presented upon the two appeals will be disposed of in one opinion.

It is important, first, to ascertain plaintiff's rights and the effect of the alleged equities of the city against him. In 1924 the city purchased the then existing water plant from the Public Service Company of

Northern Illinois for the sum of $200,000 and provided for payment of the same by issuance of certificates in an equivalent amount, bearing interest at the rate of 5 per cent, maturing over the period from September 15, 1925 to September 15, 1944, secured by a mortgage upon the system and payable out of the water funds collected by the city.

In September, 1926, the city, finding the existing system inadequate, enacted an ordinance approving plans and specifications for an extension or enlargement to be known as System No. 2, and on January 31, 1927, passed another ordinance authorizing issuance of water fund certificates in the amount of $350,000, bearing interest at the rate of 5½ per cent, payable over a period of years beginning August 1, 1927, out of water funds and secured by a mortgage upon the extension. Each mortgage was executed as provided in the respective ordinances.

On April 20, 1936, one O'Brien, a broker in municipal securities, proposed to the city that, inasmuch as principal and interest of approximately $100,000 upon water certificates were past due and refunding was desirable, he would (1), "lend" his "best efforts toward refinancing" all certificates of each issue outstanding, thereby placing "the water department on a sound financial basis"; (2) pay all costs incidental to securing deposit of outstanding certificates, and (3) "purchase at par and accrued interest the new bonds (certificates) issued, to bear interest at the rate of 4¾ per cent" and for such services charge 5 per cent of the par value of the new certificates. This proposal purported to be accepted in behalf of the city on April 21, 1936, by the Mayor, the Commissioner of Finance and the Commissioner of Public Property, the municipality being under the commission form of government. Apparently the negotiations progressed no further until September 8, 1936, when O'Brien further proposed that, in view of the total indebtedness of the water department of $464,000, he would deliver to the city for cancellation $464,000 par value of outstanding certificates and procure cancellation of interest in addition thereto. For doing this, he proposed that the city deliver to him $452,000 par value legally issued refunding certificates bearing interest at 4 per cent. The difference of $12,000 represented certificates then held by the city. The municipality was to adopt an ordinance necessary

to effectuate the refunding to the satisfaction of O'Brien's attorney and to enact such other ordinances as his attorney might deem desirable "to provide additional security." The amount of certificates maturing each year was to be agreed upon by the city and himself. The final paragraph of his proposal recited that the agreement was "dependent upon my ability to deliver the above described water revenue certificates under the conditions and terms set forth." An acceptance in behalf of the city was signed September 8, 1936, by the Mayor and the Chairman of the Finance Committee.

After April 20, 1936, O'Brien, acting for himself or Allyn & Company, who furnished the money, purchased $211,000 par value certificates of the 5½ per cent issue at the rate of 70 cents on the dollar. Some $30,000 in addition were purchased in the same manner from other bondholders at various prices. The proposal dated September 8, 1936, which was to expire in 90 days, was never formally renewed. O'Brien testified that in the purchase of the certificates he acted as an independent broker and eventually found himself unable to purchase the remainder of the outstanding certificates and never got in position to deliver them to the city; that he was able to procure certificates aggregating only $243,000, and that he did not and could not complete his proposal because it was impossible to procure the other outstanding certificates. He testified also that the city never tendered him any refunding certificates. After it became apparent that O'Brien's undertaking could not be completed, the city employed another brokerage company in an attempt to effectuate refunding.

There were various trades in the securities among Allyn & Company, Stifel, Nicolaus & Company and others between October 15, 1936 and November 15, 1937, at prices ranging from 70 cents to par. Eventually on August 18, 1937, Stifel, Nicolaus & Company sold to one Mott in Detroit, Michigan, $222,000 and on November 17, 1937, $21,000 in certificates, all at par. Mott paid cash and entered into no arrangement for repurchase by the seller. The securities were sold to him without recourse and for cash. Thereafter Mott sold them to plaintiff at par. Plaintiff executed his note for the full amount and deposited the certificates as collateral security for its payment.

We are first confronted with the question of whether plaintiff, in the situation he finds himself, is bound by any alleged latent equity in the favor of the city as against O'Brien and Allyn & Company. The master found, and the court agreed, that plaintiff stood in the shoes of Allyn & Company. But the evidence discloses that plaintiff is a purchaser for value and had no knowledge of any dealings between the city and O'Brien or Allyn & Company.

Under the Illinois law, the certificates, being payable solely from the water fund, are not negotiable instruments within the meaning of the law. Northern Trust Company v. Village of Wilmette, 220 Ill. 417, 77 N.E. 169, 5 Ann.Cas. 193; Morrison v. Austin State Bank, 213 Ill. 472, 72 N.E. 1109, 104 Am.St.Rep. 225; First National Bank v. City of Elgin, 136 Ill. App. 453, 463. Under these authorities, a bona fide purchaser of certificates in good faith holds them subject to "defenses available between the original parties." He stands "merely in the shoes of the original payee." From this defendants argued, and the court found, that plaintiff held the certificates subject to any latent defense in favor of the city against Allyn & Company. But the doctrine does not go so far. It is not insisted here that there was any defense to the certificates in favor of the city as against the original payee but it is asserted that a defense has come into existence subsequent to the original issue by virtue of transactions between the city and Allyn & Company. Even strictly non-negotiable paper passes free of latent defenses, except those existing against the original contractor, to any bona fide purchaser except one who takes from a thief or a finder. The certificates possess all the qualities of negotiable papers except one, namely, that they are open to any defenses which might have been made to the consideration upon which they were originally founded. For all purposes involving title, they are negotiable. The cases relied upon by defendants do not militate against this doctrine. They merely hold that if warrants covering a special improvement are issued to a contractor and illegality or fraud occurs in performance of the contract, any purchaser of the warrants takes them subject to such defect and may not recover except subject to such defenses. Northern Trust Co. v. Wilmette, 220 Ill. 417, 77 N.E. 169, 5 Ann.Cas.

193. Here the doctrine of other Illinois cases controls. Thus in Silverman v. Bullock et al., 98 Ill. 11, the court said: "Persons dealing in such securities can, without difficulty, inquire of the makers if any defences exist against them, but more than that it is not practicable to do. Of course, it would not be possible to discover, even by the utmost diligence, all persons that might have equitable rights in the subject matter of the assignment, and the adoption of a rule that would let in latent equities to prevail against the assignee, would be to ensnare dealers in such securities."

The rule is the same as that governing assignment of a chose in action, namely, that one takes it subject to any defenses which might have been made to the claim upon which it is founded. Freiner v. Lane, 302 Ill.App. 248, 23 N.E.2d 750. That the city recognized this rule when it executed the mortgage appears from the language of the latter as follows: " * * * any purchaser before maturity of the certificates, whenever unregistered, or of the coupons, shall not be required to inquire into the title of the respective holders thereof, or to take any notice of any trust relating thereto, or, except by express notice thereof, be affected by the right, title or claim of any other person thereto, it being the intention hereof that the purchaser in good faith for value and before maturity of the certificates, whenever unregistered, or of the coupons, shall not be affected (unless he shall have actual knowledge thereof or unless the same be set forth in the certificates or coupons of this mortgage deed of trust) by any notice, facts or things that may at any time affect the relations between the City and pay prior holders or owners of said certificates or coupons."

The title of plaintiff as a bona fide purchaser for value of non-negotiable certificates without notice of defense, like that of an assignee of a chose in action, is in no wise affected by any latent equity arising, not out of the consideration upon which the certificates were issued but out of unknown dealings between the issuer and an intermediate holder in plaintiff's chain of title.

Even were plaintiff bound by the so-called proposal and negotiations between O'Brien and Allyn & Company on the one hand and the city on the other, upon analysis of those transactions, it is apparent that no equity arises in favor of

the city. The first proposal, that of April 20, 1936, was not one which bound O'Brien to do anything other than "to lend his best efforts toward refinancing the obligations outstanding." The second was expressly subject to and "dependent" upon his ability to purchase and deliver the outstanding securities in exchange for the refunding certificates. The evidence is undisputed that he was never able to comply; that he found it impossible to procure all of the outstanding certificates and so notified the city. Neither proposal required him to deliver to the city anything less than the entire outstanding lot of certificates, and he was bound to do that only if he were able to procure all of them. When this condition, upon which existence of a binding contract depended, remained unsatisfied, all obligations of the city to him and of him to the city were at an end. Such certificates as he and his associate, Allyn & Company, had been able to procure, they had purchased in the open market without any promise, express or implied, to resell them to the city, even if the latter could legally purchase the same. Had Allyn & Company purchased them at $150 the loss would have been that firm's, not the city's; it alone took the chances of ownership, of gain or loss, when it purchased the certificates. Parties are not endowed with right of action for breach of contract, or to have the court declare a trust, by virtue of conditional contracts which, because of failure of prescribed conditions, never come into effective legal existence. There is no evidence, therefore, justifying the conclusion that Allyn & Company or O'Brien, failing in their efforts to purchase all of the outstanding warrants, owed any duty of any character to plaintiff with regard to certificates they had purchased with their own means. Plaintiff is the bona fide holder of certificates entitled to enforce his remedies with respect to the principal and interest payable thereunder.

■ We are faced, however, with the question of fact as to whether there have been improper diversions of funds properly applicable to the certificates held by plaintiff and others. Under the statutes of Illinois, the city, in collecting water funds and applying them to the discharge of certificates, is a trustee and if as such fiduciary it diverts or misappropriates trust funds, the holders of certificates are entitled to complain of the action and recover a judgment at law against the officials guilty of diversion or misappropriation. Rothschild v. Village of Calumet Park, 7 Cir., 350 Ill. 330, 183 N.E. 337; City of Jacksonville v. Bankers Life Company, 90 F.2d 141; People ex rel. v. Village of Bradley, 367 Ill. 301, 11 N.E.2d 415. The holders have the further right to a judgment requiring payment of matured certificates in their proper statutory order and calling for restoration of funds to meet payment of matured and unmatured certificates. City of Jacksonville v. Bankers Life Company, 7 Cir., 90 F.2d 141. Consequently, if the evidence shows that funds were disbursed illegally by the corporate authorities, the latter are personally liable therefor; their wrongful acts cannot be ratified or legalized by the city council and they may be compelled to restore the funds to their proper place in the city treasury.

In his final report, the master found that the city had sought to circumvent the principal and interest on the certificates purchased by Allyn & Company by commingling, juggling and otherwise diverting the water funds. "Viewed in the most charitable light," said he, "such conduct on the part of such officials in handling such funds amounts to at least gross carelessness on their part." But this fact he held immaterial because he erroneously concluded that the city had a latent partial defense growing out of its transactions with Allyn & Company, subject to which plaintiff took his certificates. Consequently he made no formal finding as to amounts or circumstances abiding in the diversion and misappropriation.

However, the evidence discloses without any controversy that between September 15, 1925 and April 30, 1939, the water funds collected by the city were more than sufficient to have retired all maturing certificates and all maturing interest. Instead of making proper application, however, the city failed to pay upon matured principal $82,000 and upon matured interest $111,550, a total of $193,550. These facts, of themselves, were sufficient prima facie evidence, unexplained, to show diversion or misappropriation of water funds to the extent of $193,550. At the time he began suit plaintiff held matured certificates of $20,000, upon which the accrued interest was $2,365 and matured coupons on other certificates amounting to $84,507.50, a total of $106,-872.50, all payable out of water funds which

had been collected but for which the city had failed to account.

The diversions were of various characters. The ordinance provided that the city should pay hydrant rentals of $35 per annum for each of 786 hydrants. The aggregate amount due from the city annually therefor was $27,510 and the total amount maturing from 1932 to 1939 was $220,080. However, the city failed to appropriate sufficient funds. In 1932, $15,000 was appropriated and levied; in 1933, $10,000; in 1934, $10,000 and in 1935, $10,000. Thereafter no appropriations were made. The total amount appropriated for hydrant rental was $45,000. Consequently the city has failed to appropriate $175,080 due for water rental under its own ordinance. In addition hydrant rentals of $22,911.33 collected from 1932 to 1934 have not been paid to the water department. Here was clearly a shortage of $175,080, which in good faith, under its ordinance, the city was bound to appropriate for the purpose of realizing funds with which to retire the certificates.

On April 30, 1931, the city owed the water department $7,599.99 in one sum and $91,809.38 in another. These were part of municipal indebtedness aggregating $199,358.32. On November 30, 1931, the council passed an ordinance authorizing borrowing $200,000 upon general corporate bonds and providing for their payment by levy and collection of a direct annual tax. The bonds were issued and the city delivered to the water fund 95 bonds of $1,000 each in satisfaction of the hydrant rentals accruing prior to November 30, 1932, in the amount of $97,485.81. Bloom, commissioner at the head of the water department, then delivered the bonds to the city treasurer. 38 of these bonds were subsequently sold to discharge special assessments charged to the water department. The remaining 57, aggregating $57,000, remained in the custody of the treasurer until April 30, 1939, when they were cancelled, at the direction of the commissioner of finance. While the bonds were outstanding, the city treasurer collected $107,278.07 in taxes applicable to the total issue of $200,000. Out of this the treasurer paid $15,000 on the principal sum of the bonds and $57,510 on accrued interest. Obviously the remainder of the tax collections, namely, $34,768.07 should have been applied toward the retirement of bonds and interest. Yet none of this money has been paid to the water department, although the bonds were delivered to that department to pay for the hydrant rental. Clearly this was a diversion of funds, wholly unexplained by defendants.

On January 4, 1937, the city received from the Village of Dixmoor a check for $10,000 in payment of water purchased from the city of Harvey. This was converted into a certificate of deposit which was retained by the city. On June 7, 1937, the credit was converted into a cashier's check delivered to the Mayor, who thereupon purchased $10,000 in water fund certificates of the same character as those held by plaintiff for $10,000. These bonds apparently were held by the Village of Dixmoor. The $10,000 thus expended should have been deposited in the water fund and distributed in due course to certificate holders in accord with the city's statutory duties.

On June 24, 1937, the city purchased water fund certificates at par in the sum of $5,000 from Mr. Dowdle. On the same date it received from the Village of Markham for water delivered $15,085.98 and out of this, certificates were purchased at par to the extent of $12,820. The balance, on deposit in a special fund, was $2,265.98. This total sum of $15,085.98 should have been delivered to the water fund.

On December 6, 1938, the city purchased with water funds, $5,000 in certificates at par. The Village of Phoenix on May 3, 1937, paid $15,000 due the city for water by certificates at par. The Ingalls-Shepard Company similarly paid its water rental to the extent of $10,000 in water certificates. 79 other certificates were purchased by the city from various individuals, only nine of which had matured at the time of the accounting and the next- of which matures February 1, 1942. On June 20, 1939, the city purchased certificates from the R.F.C. for $22,000. All these purchases were made without authority of ordinance or resolution and in the very teeth of the existing ordinances and statutes, which prescribe that water funds shall remain inviolate for the payment of certificates and that the latter shall be paid in a certain specified order.

The city, by virtue of an enacted ordinance, issued scrip in payment of moneys due and the water department accepted it in payment of water bills to the extent of $18,036. On June 25, 1939, there

was on hand, scrip, counted as cash, of $20,000. The city accepted in payment of water accounts, wage assignments amounting to $5,956.69. It paid, from water funds, to the First National Bank of Blue Island, for commissions due it in making sales of $38,000 of the general corporate bonds, $2,910. It charged off as worthless water rentals, aggregating $56,017.15 as bad debts and other water rentals in the sum of $11,818.51. It paid from water funds to attorneys and auditors $17,012.50, for general bond expenses $4,461.07, and in settlement of a judgment against the city, $300. No ordinance authorized any of these acts, other than issuance of scrip.

The city in 1938 issued general refunding bonds in payment of claims against it amounting to $129,000. $88,000 of these bonds were delivered to one Hoffman as trustee to secure various claims against the city, included in which was $33,172.33 due the water department. The water department in due course received $22,235, incurring a loss of $10,937.33, consisting of $7,000 in bonds which Hoffman surrendered and a charge made against the department of 15 per cent for collection. The surrender of $7,000 in bonds was unjustified and unauthorized but done at the city's request. Nor is there any evidence justifying the collection charge.

There was a prima facie case of depletions of water funds as follows: Fire hydrant rentals, $175,085; cancellation of general bonds belonging to the water fund, $57,000; unauthorized expenditures from the fund, $24,673.57; unauthorized charge-offs credited to the city, $56,017.15; other unauthorized expenditures from water funds, $19,815,102; loss of the water department arising from improper cancellation of $7,000 in bonds and unjustified charge of commission for collection, $10,937.33, and of diversions of funds as follows: Tax moneys collected for hydrant rental but never paid into the fund, $22,911.33; tax moneys collected for retirement of interest upon general bonds held by the water department, $23,940; unauthorized use of water funds expended in improper purchases of certificates, $79,820; moneys on hand collected from the Village of Markham for water, $2,265.98; illegal scrip held and treated as cash, $18,036. Prima facie then the city depleted the water funds and diverted them to the extent of $490,496.38.

When plaintiff showed that the city had collected the money applicable to the payment of the certificates and had not applied it, he had met the burden imposed upon him and was entitled to judgment, in the absence of valid defense. Rothschild v. Calumet Park, 350 Ill. 330, 183 N.E. 337. The Illinois law does not countenance evasion by a municipality of its debt or its duty as a trustee by wilful or negligent failure to apply toward the discharge of obligations funds collected by it for the specific purpose of meeting such demands. People v. Village of Bradley, 367 Ill. 301, 11 N.E. 2d 415; Allbee v. Aurora, 306 Ill.App. 457, 28 N.E.2d 742.

We find in the record no defense meeting in any way the case made out by plaintiff. The $57,000 in general bonds had by proper corporate action been allotted to the water fund. They could not thereafter be taken from that fund. Where the city council has formally voted upon a proposition and there is no motion for reconsideration, it may not reconsider its action where the rights of other persons intervene. Kankakee v. Small, 317 Ill. 55, 147 N.E. 404. As the moneys or securities were to be applied toward the payment of outstanding obligations payable out of the fund, plaintiff's right therein became vested and no subsequent act of the municipality might deprive him of such right. The city was charged by law to accede to the faithful application of the bonds. Town of Aurora v. Chicago, B. & Q. R. R. Co., 119 Ill. 246, 10 N.E. 27; Peoria & Pekin Union Ry. Co. v. People, 144 Ill. 458, 33 N.E. 873.

The scrip issued by the city was attempted to be justified by an ordinance authorizing it but that the same was wholly improper appears from Hewitt v. Board of Education of Normal School District, 94 Ill. 528, where it is said that municipalities, in the absence of endowment of power so to do in their charters, have no authority under any circumstances to make and place on the market such paper. People ex rel. Hurd v. Johnson, 100 Ill. 537, 39 Am.Rep. 63; Coquard v. Oquawka, 192 Ill. 355, 61 N.E. 660; Thomas v. Richmond, 12 Wall. 349, 79 U.S. 349, 20 L.Ed. 453.

Nor, under the same authorities, was there legal right to accept wage assignments in payment of water bills. Furthermore the various payments made to individuals or others from water or other funds without appropriations or otherwise were in violation of the Illinois laws. Where no appropriation is made for work in ex-

cess of the statutory amount, it is impossible for any act of the city officials to create a liability. The taxpayers have a right to see that public money is properly appropriated, and of this right they cannot be deprived. May v. City of Chicago, 222 Ill. 595, 78 N.E. 912; Gathemann v. City of Chicago, 263 Ill. 292, 104 N.E. 1085; Siegel v. City of Belleville, 349 Ill. 240, 181 N.E. 687; People v. Hummel, 215 Ill. 71, 74 N.E. 78. Nor could the city rightly compromise the claims it held against other municipalities for water funds for less than their full amounts. People v. Holten, 287 Ill. 225, 122 N.E. 540; People v. Parker, 231 Ill. 478, 83 N.E. 282.

It is apparent that the various depletions and diversions proved by plaintiff are without defense and he is entitled to a decree restoring the funds to the water department and their application made to the payment of his matured principal and interest in accord with his rights under the statutes of the State of Illinois, due regard being had to the rights of other holders.

In 7481 defendant appeals from the judgment in so far as the court refused to hold that the city was without legislative power to issue the warrants or to create two special water funds and in so far as the court held the city estopped to deny validity of the certificates, contending that, under the act of July 1, 1899, Laws 1899, p. 104, Smith-Hurd Stats.Ill. c. 24, § 440 et seq., the city exhausted all of its power to issue certificates when it enacted its original ordinance for the purchase of plant No. 1 and issued certificates for the cost thereof.

The title of the act embraces the idea of grant of authority to cities to build or "extend" waterworks "systems" for public and domestic use and provide for the cost thereof. Section (1) authorizes a city to acquire waterworks by building or purchasing a waterworks system or by enlarging or extending an existing system and to issue certificates for indebtedness to cover the cost of such purchase or enlargement at par in payment for the construction, erection, purchase or extension. Under Section (3) the entire proceeds realized from the operation of the waterworks system are to be paid into a special fund known as the water fund.

By ordinance, duly adopted on August 4, 1924, the city authorized purchase of the water distribution system then existing in Harvey and then operated by the public service company by paying therefor $200,-000 in certificates secured by a mortgage upon the works and payable out of its earnings. This plant is designated in the record as System No. 1. On September 20, 1926, the city adopted an ordinance approving plans for construction of an enlargement or extension of the old system, to be designated as System No. 2. The ordinance recited that it was adopted in pursuance of the act of 1899 and other acts of the State of Illinois pertinent to the subject matter and that, in pursuance of the provisions of these statutes, the city had determined to cause to be constructed and acquired an "extension of its water distribution system." Later the city passed an ordinance authorizing issuance of water fund certificates of $350,000 in payment of the cost of the extension. This ordinance recited that the existing system was "wholly inadequate in its capacity to serve the necessities of the city" and provided that the moneys received from each system should be allocated to fund No. 1 and fund No. 2 in the same proportions as the amount of water pumped through System No. 1 compared with the water pumped through System No. 2, as shown by intake meters to be maintained for each system. It was further directed that the moneys deposited in fund 2 should remain forever "inviolate for the payment of the cost of operation and maintenance and of the principal and interest of certificates of System No. 2 and for no other purpose." A similar provision was made with regard to the funds for System No. 1, it being especially provided that no part of the same should be considered pledged for payment of certificates of System No. 2 therefrom. The mortgage, executed pursuant to the ordinance, contained a similar recital.

It appears, however, that the city never installed intake meters for either system and apparently all water funds were kept in one fund. Plaintiff, through the testimony of a public accountant, made an allocation, however, of the earnings of the two systems by comparing the earnings prior to the creation of the extension and those thereafter. In the two years when System No. 1 operated alone, its average net earnings were $26,591.71 annually. Using this as a basis, in comparison with the earnings thereafter, the accountant found that the total net profits from the water company from 1924 to 1938 were $744,633.-84; that these should be thus allocated: to System No. 1, $388,901.77, to System No. 2, $355,732.07. As the city had found

the old system inadequate and it was several years old, it is a fair inference that its earnings did not increase over what it had previously earned. Had the funds, thus allocated to System No. 1 for the retirement of its certificates, after the cost of maintenance, been properly applied, the total principal and interest maturing, $232,-350, would have been satisfied and there would have been remaining in the fund a balance of $156,551.77, available for retirement of certificates not yet matured. During this period, however, the city paid only $175,225 of matured principal and interest of the original certificates, there being actually in default, on April 30, 1939, matured principal and interest of $57,125 of those certificates.

The $355,732.07 allocated to fund No. 2 would have met all maturing principal and interest on certificates payable out of that fund during the same period, the total maturing principal and interest being $266,100. After satisfaction of these maturities, there would have been left from the earnings, allocated to No. 2, a surplus of $89,632.07 applicable to principal and interest not yet matured. As a matter of fact, however, during said period, the city retired only $129,675 of principal and interest of these certificates. As a result, it was in default in principal and interest on this series in the sum of $136,425.

■ We have related these facts in order that the situation may be clear and the positions of the parties viewed in connection with the surrounding circumstances. Defendants' contention is that when the city issued the certificates to buy plant No. 1, it thereby exhausted all its statutory power and had no right thereafter to issue additional certificates payable out of funds arising from earnings of the extension or enlargement. But the act authorizes cities to build, purchase or extend waterworks "systems." It does not forbid more than one system, but strongly suggests power to build, enlarge and pay for more than one system. It contemplates purchase or construction of a plant and, in addition, extension or enlargement thereof, and expressly authorizes the city, in payment of the cost of such building, enlargement or extension, to issue water fund certificates, payable out of the proceeds arising from the operation. It would seem obvious that the legislature did not contemplate that the city might allocate funds arising from earnings of an existing system to payment of the cost of

any extension at the expense of outstanding certificates. The latter were valid obligations of the city and holders' right therein could not constitutionally be damaged. The funds allocated to the payment of existing certificates were, by statute, inviolate for that purpose and the city would not legally pledge them to secure additional securities. But we find nothing in the act and no decision of Illinois holding that the city might not authorize extension of an inadequate system and pledge the earnings from such extension to the payment of certificates issued in payment of its cost. The legislature granted power to a municipality to create and maintain a waterworks system which if in time became inadequate, it might enlarge or extend. There is no curtailment of municipal authority in this respect; it is only essential that the securities previously issued be in no wise repudiated or injured. The act includes nothing implying that, having once issued certificates, the city was rendered powerless to enlarge or extend an inadequate system merely because certain valid outstanding certificates were still to be paid, so long as the inviolability of such existing certificates was protected and preserved.

Nor did the attempted allocation of earnings from the two plants work any violation of the act. By the ordinance the earnings of the two systems were actually and expressly allocated equitably to the certificates of the original system and those of the enlargement. It is of no moment that the ordinance referred to funds No. 1 and No. 2. It was not essential that the funds be separated upon the books. It was only necessary that the earnings be applied, when distributed, in accord with the rights of the respective securities outstanding under the two issues.

■ True it is that the city failed to live up to its ordinance in that it did not install meters. But it is also true that the evidence clearly justifies a definite finding of the amount earned by the formerly existing system and the amount earned by virtue of the enlargement. It was only necessary, therefore, that the city, in distributing the earnings, abide by its obligations under its respective trusts and apply the respective proportions to the respective issues. This entailed little or no additional bookkeeping and no hardship would have arisen in preserving the inviolability of the two issues. Each of the respective earnings was far more than sufficient to meet the necessi-

ties of each of the respective series. We think that the acts of the city were clearly within the legislative enactment of 1899 and we believe our reasoning is supported by such decisions as Ward v. City of Chicago, 342 Ill. 167, 173 N.E. 810; Simpson v. City of Highwood, 372 Ill. 212, 23 N.E.2d 62, 124 A.L.R. 1459, as well as City of Jerseyville v. Connett, 49 F.2d 246; Connett v. City of Jerseyville, 96 F.2d 392, decided by this court. The act of July 8, 1927, Smith-Hurd Stats., Ill. c. 24, § 456a et seq., which expressly provided for allocation of earnings of different systems, it seems to us, does not militate against the validity of these certificates under the act of 1899. The later act did not repeal the first; it only created additional and more facile methods. However, under its history in Illinois, the statute of 1899 appears to be equally comprehensive in providing equally efficient remedies. Evidently the act of 1927 was enacted out of an abundance of legislative caution.

▮ There is another reason why the decree of the court in refusing to declare the certificates invalid was proper. It is clear that the city had, under the act of 1899, power to build and to enlarge water systems. The city was not without legislative authority to act. The most that can be said in defendants' favor is that it had power to do what it did but employed the wrong formula. This presents no absence or lack of authority but mere irregularities in doing something which the statutes had given it power to do. In the former case, a municipality is not estopped. In the latter, where securities have been issued and the city has received the benefit, it is estopped to set up the irregularities. Thus, in Burr v. City of Carbondale, 76 Ill. 455, the court said:

"So, by parity of reasoning and analogy, if a municipal corporation, authorized by law, issue its bonds in furtherance of a corporate purpose, and in substantial compliance with the law authorizing their issue, and such bonds come into the hands of an innocent holder, even if there be irregularities not going to the power, the bonds must be held valid. If the power existed, the act is binding. * * * Where the power to issue bonds existed, the corporation is estopped from setting up irregularities in the

issue of the bonds after repeated payments of interest thereon."

Commenting more sharply upon the attempt of the city to plead invalidity in the face of its enjoyment of the benefits of its acts, the court added: "No charge of fraud, combination or oppression is made. Every act seems to have been fairly done, and in pursuance of law. The disreputable feature of the case is, that the same authority doing all these acts, and whose city has received the benefit of them, now seeks to repudiate them. There is no rule of law, equity, justice or morals compelling this, and we can not sanction it."

Pertinent in this respect, also, are People ex rel. Colfax v. Maxon, 139 Ill. 306, 28 N.E. 1074, 16 L.R.A. 178; Chicago, Rock Island & Pacific Railroad Co. v. City of Joliet, 79 Ill. 25; Lee v. Town of Mound Station, 118 Ill. 304, 8 N.E. 759; Webster v. Toulon Township High School District, 313 Ill. 541, 145 N.E. 118; City of Chicago v. McGovern, 226 Ill. 403, 80 N.E. 895; McGovern v. City of Chicago, 281 Ill. 264, 118 N.E. 3. As we said in Bank of Burlington v. City of Murphysboro, 96 F.2d 899, 904, "the trustee municipality is estopped to set up its own wrongdoing to justify its refusal to account for and pay over trust funds which it has collected for the benefit of the claimant, who, in equity and good conscience, is entitled to be paid." And as said by the court in Cook v. City of Staunton, 295 Ill.App. 111, 14 N.E.2d 696, 700, "Notwithstanding such irregularities in the issuing of the bonds the city has collected the assessments levied with which to pay said bonds and interest thereon, and paid in full all of the bonds of the first six series, and none are outstanding, and is estopped to set up as a defense in a suit instituted for the collection of such bonds as are outstanding its own irregularities in the execution of a power clearly granted it." Irrespective of any question of existence of invalidity of the issue, under the facts in this record, the city is plainly estopped to assert it.

The judgment of the District Court will, in so far as it is inconsistent with the views expressed herein, be reversed and remanded with directions to proceed in accord with the expressions herein contained. In all other respects it is affirmed.